Per Curiam :
This case was referred pursuant to former Buie 45(a) (now Buie 57(a)) to Trial Commissioner C. Murray Bernhardt with directions to make findings of fact and a recommendation for a conclusion of law. The Commissioner has done so in an opinion and report filed December 19, 1963. Plaintiff accepts the Commissioner’s opinion and findings. Defendant has excepted to the opinion and certain of the findings. The parties have filed briefs and oral argument has been had. With minor modifications, the court is in agreement with the Commissioner’s findings and recommended opinion. Accordingly, the court adopts the findings and opinion, as so modified, as the basis for its judgment in this case and concludes that plaintiff is entitled to recover and that judgment should be entered to that effect. The amount of recovery will be determined pursuant to Buie 47(c)(2).
Commissioner Bernhardt’s opinion, as modified by the court, is as follows:
The widow of an Army Beserve doctor sues to recover disability retirement pay from the time of his discharge in April 1946 to his death in 1958, on the contention that he was permanently incapacitated for active military service on the earlier date by reason of service-connected disabilities.
From 1935 to 1941 the deceased was a physician in private practice and an officer in the Army Medical Corps Beserve since 1930. At the outbreak of World War II he was on active duty with the Army in the Philippines. He was beleaguered with the Army on Bataan, was captured by the Japanese in April 1942, and participated in the infamous “death march” of the weakened and demoralized Bataan *547 survivors in their 165-mile trek to the notorious Camp O’Donnell. The starvation and wanton cruelties inflicted by the enemy on their captives during that march are a matter of historical record. The deceased bore his share of them, including a severe blow to the right kidney by a Japanese gun butt which caused a discharge of blood in his urine for two or three weeks thereafter. As a prisoner-of-war for 41 months in a succession of prison camps in the Philippines and Japan the deceased underwent illness and privations to a degree which led consultants for the Veterans Administration to remark in 1951 that “This patient has been exposed to as severe physical and emotional experiences as is consistent with the retention of life.”
Conditions for the prisoners-of-war in the Philippines were vile. Hundreds died daily. Nutritional diseases and dysentery were endemic. Food was grossly insufficient and the prisoners were at times reduced to eating insects to maintain life. The deceased served as Chief of Medicine at the camps. His weight dropped from 190 to 125 pounds. As a result of avitaminosis (vitamin deficiency) he developed wet beriberi and temporary scurvy in 1942 and slight pellagra and partial night blindness in 1945. He also suffered from hypo-proteinemia (abnormal protein decrease in blood) and experienced bacillary and amoebic dysentery during the first year of his captivity, associated with severe abdominal pain, fever, and blood and mucous in his stools. During captivity he had several attacks of kidney colic and passed a stone from the left kidney in 1943. Throughout this period and for six months thereafter he had marked edema in all dependent portions of his body, probably caused by beriberi. In spite of these serious ailments the deceased attended to his official medical duties in the prison camps and administered to the sick and dying. He was liberated in September 1945 and returned to the United States.
It was the unanimous opinion of those who knew him intimately 'before the war that the deceased had then been an exceptionally vigorous, active and healthy man. He was a successful and hardworking general practitioner and surgeon with an active practice which kept him occupied from 14 to *548 16 hours daily. He was never sick. His Army physical examinations from 1928 to 1941 corroborate that he was physically qualified for active duty as a commissioned officer at all times.
Upon his return to the United States a drastic change in his physical condition was readily apparent to his friends and associates. These witnesses, who were professional people in the medical, dental, and allied fields, observed that the deceased had aged in appearance far beyond his 89 years and had become a “broken old man”. He had a sickly look with an unhealthy pallor contrasting with his former ruddy complexion. He had poor muscle tone and was flabby, especially around the eyes. He had noticeable edema in his hands, feet and ankles and wore special shoes because of the swelling. He had a shuffling gait in contrast to his bouncing stride before the war, was shaky and short of breath, and complained of feeling weak. He could no longer engage in physical activities such as swimming, playing ball, or mowing the lawn. He habitually relied on sleep-inducing drugs. In contrast to his jolly prewar personality he became irritable, anxious and apprehensive, and avoided social and professional activities which he had previously enjoyed. He became and remained impotent, probably due to psychiatric causes (the “POW syndrome”). Other conditions manifested themselves as referred to in the accompanying findings. There is no reason to doubt the credibility of the witnesses whose sworn testimony produced these findings. They were professionally qualified by training and circumstance to observe such matters and to detect humbugging.
The dramatic deterioration in the deceased’s health and well-being on his return from overseas was incompatible with the findings in. the terminal physical examination given him at Brooke General Hospital over a three-day period in December 1945. Despite the patent manifestations of his impaired health the physical examination produced largely negative results. No abnormalities were observed with respect to blood pressure, EKG, chest, urine and blood. His kidneys were found to be of normal size, shape and position. His heart tones were of poor quality and their sound was “distant and poorly heard”, but without murmurs or thrills. *549 His weight was within normal limits and, although there is reason to attribute part of his weight to edema, no reference is made to edema in the report. He was accordingly diagnosed as “No disease, observation for malnutrition”, and was found fit for general military service. Since the deceased was at the time anxious to expedite his discharge in order to resume the practice of medicine, he was placed on terminal leave and was relieved from active duty on April 27, 1946. It would be rather remarkable that a man could have survived the deceased’s experiences during his 41 months of captivity and have been in the state of normal health reflected by the December 1945 physical examination, particularly in view of the emphatic eyewitness testimony to the contrary. Unless, of course, the examination was inadequate as the plaintiff’s medical expert speculated to be the case, although the deceased himself had remarked later in 1951 that, except for the eyes, it had been a “pretty good examination although they ran through it pretty fast.” In the rapid demobilization of the Army after the war it is quite plausible that terminal physical examinations were not as thorough as they might have been in many cases and that a more intensive investigation of the deceased might have developed hidden clues of things to come.
After his release the deceased arranged to resume his practice in Miami, Florida, but for the first six months was physically unable to practice. When he did resume it was on a reduced scale, and in obstetrics instead of surgery because the latter was too strenuous. Despite the help of associates and nurses he found himself too indisposed to engage in fulltime practice and after about two years was forced to curtail 'his professional activities, so that by April 1949 his practice had dwindled by 50 percent. From November 1949 to June 1950 the deceased could not work at all due to several hospitalizations, and from then to his death in 1958 he could work at his office only about two hours a day.
He remained in the National Guard and participated in a few summer tours and attended periodic meetings, but performed only nontaxing administrative duties. To retain his commission he passed routine physical examinations in 1947 and 1948 which reported normal readings for weight and *550 blood pressure. Even so there seemed to be no improvement in his condition and he consulted private physicians from 1948 on.
Early in 1949 he suddenly developed an advanced state of hypertension characterized by high blood pressure. His private physician reported him to be a “very ill man” suffering from advanced hypertension and congestive heart failure. An eye doctor found evidence in his eyes of very serious progressive hypertension and estimated a statistical life expectancy of five years. He experienced dizziness, headaches, migratory joint swellings, and severe stomach pains. He entered Vanderbilt Medical School in August 1949 for a checkup and was found to have “left ventricular hypertrophy. Eecord suggests myocardial disease.”
He was next hospitalized at the Veterans Hospital in Coral Gables in January 1950 and was diagnosed with “hypertensive heart disease with left ventricular hypertrophy, Class I.” His heart was found to be slightly enlarged to the left. Otherwise the deceased was noted as normal with respect to general appearance, muscalature, posture and gait, thus repeating the anomaly between the way he felt and looked to his associates and the way he checked out on examination.
In September 1950 the deceased applied to the Veterans Administration for disability compensation. The Rating Board was puzzled but concluded in strong terms that in some way not completely established medically the deceased’s condition was the consequence of his wartime experiences as a prisoner. Despite the recommendation of the Regional Office that service-connection be granted, the Veterans Administration Claims Service denied the application but recommended consultation of additional hospital records. This was done and the Rating Board then denied the application. It was renewed and, with additional hospitalization data before it in the intervening time, the Rating Board again denied the application in early 1951. However, on a rehearing in April 1951 the Rating Board appointed a committee of special cardiac consultants which reached the following conclusion :
In summary these examiners believe that there is a possible and even probable connection between the present ill *551 ness of this patient, hypertensive cardiovascular renal disease and the physical and emotional traumata experienced while a prisoner of war. It is likely that the degree of heart involvement now noted is referable to the previous damage of his heart. It is possible too that he has incurred a hypertensive disease as a result of renal and other damage incurred while a prisoner of war.
On the basis of this advice the Veterans Administration in May 1951 reversed itself and granted service-connection for hypertensive heart disease with chronic congestive failure and pulmonary fibrosis. It concluded that these conditions had their origin in the emotional and physical traumata resulting from his experiences in the “death march” in 1942 and his subsequent experiences while a prisoner-of-war.
In the meantime the deceased underwent further hospitalization, the information as to which was considered by the Veterans Administration as stated above. Suffering from severe hypertension, he had a thoracolumbar sympathectomy performed on the left and right sides at the Mayo Clinic in November 1950. In this radical two-stage operation, which is used only in cases of advanced hypertension to prolong life, certain spinal nerves are sectioned to lower blood pressure. The deceased barely survived the operations. The clinic felt that the connection between his poor post-operative state and the possibility of permanent damage to the heart due to the wartime experience of beriberi was necessarily conjectual. For three months from December 1950 through February 1951 the deceased was hospitalized at Coral Gables for the effects of his hypertension, which the sympa-thectomy had apparently not corrected. Finding 15 describes his condition on this occasion.
In 1953 and 1956 the deceased applied unsuccessfully to the Army Board for the Correction of Military Kecords to have his record corrected to show him retired by reason of physical disability. On neither occasion was he given a hearing, although possibly he would have except for the cost (to him) of producing witnesses. The applications were successively denied in September 1954 and February 1957, after the Correction Board had obtained advice from the Surgeon General. The Board and the Surgeon General had available *552 for their consideration all the records of the Veterans Administration relative to deceased’s medical problems, but it cannot be determined what weight was given to the evidence because the reports are conclusionary in nature and do not discuss the details or specify precisely what items of evidence were considered. All we know is that the Surgeon General advised that the evidence did not support the claim, that there was no clear evidence of hypertensive heart disease in 1946, and that the cause of that disease was not known to be the consequence of deceased’s wartime experience.
The next and final episode occurred in 1958. In the intervening years the deceased resorted to various treatments and anti-hypertensive medication but did not improve. In April 1958 he entered the Cleveland Clinic and underwent an operation for the removal of his right kidney. Three days later he died, on May 17, 1958, specifically of left ventricular failure precipitated by operative stress. On autopsy it was discovered that his heart had undergone an enlargement of 36 percent, and that his right kidney had shrivelled to 6 cm. in length compared to 13 cm. for his left kidney. The right kidney had virtually ceased to function, due to severe ar-teriolar sclerosis and a closure of the right renal artery from severe atherosclerosis.
In 1959 the widow reapplied to the Army Correction Board, attaching to her application the medical records from Vanderbilt Hospital, Mayo Clinic, the Veterans Hospital at Coral Gables, and the Cleveland Clinic, together with written statements from various physicians, nurses, and other professional persons who had close association with the deceased. The Correction Board requested a comprehensive opinion from the Surgeon General, who reaffirmed his previous advice that the deceased was not entitled to disability retirement at the time of his discharge in 1946. In May 1960 the Correction Board, apparently in reliance on the advice of the Surgeon General, denied the application without a hearing. The widow had requested permission to have witnesses appear in person “if necessary”, but the Board felt that no material evidence of error or injustice was shown to warrant a hearing. Neither the Board decision nor the cursory advice of the *553 Surgeon General on which it was predicated discussed the evidence in the case but reached only broad conclusions.
On this state of facts can it be said that the Board’s action in each of its three adverse decisions was arbitrary, capricious, erroneous in law, unsupported by any substantial evidence, and contrary to the evidence, all of which the widow alleges? A presumptive correctness attends the administrative decision in these matters, but in the final analysis the court must review that action. The fact that the Veterans Administration found service-connection does not alone determine the issue against the Army, for the relevant standards differ. However, the medical views of the Veterans Administration are entitled to great weight.
With these factors in mind, it must be held that the deceased was permanently incapacitated for active military service at the time of his release in 1946. His incapacity and the causes thereof were incidents of his service. The decisions of the Correction Board to the contrary were not based on substantial evidence for two reasons. First, there is no satisfactory indication that they were based upon a balanced consideration of all the evidence available and presented. Where the medical issue is complex and in considerable dispute, and the Veterans Administration has previously found service-connection, a disposition of the claim for disability retirement by the Correction Board without a hearing and without an analysis of the evidence in writing is inadequate assurance that due weight was given to all of the evidence, both medical and nonmedical, even though the opinion may formally recite that it was based upon all of the evidence. Second, even if it were to be assumed that the Correction Board considered all of the evidence, the causes of the deceased’s physical disability at the time of his discharge, while not susceptible of precise diagnosis even in the present state of medical knowledge, nevertheless existed and related to impairment of his heart, kidney and circulatory system as a direct but undetected result of his wartime deficiency diseases, kidney injury, and psychological trauma. The transformation of the deceased from a prewar condition of robust health to a postwar condition of broken health, in *554 the total absence of known causative factors other than his wartime medical history, compels the conclusion that plaintiff was disabled when he was released from active service, despite some possible technical difficulty in reconciling medical laboratory findings of normal functioning with the overwhelming and uncontested proof of deceased’s dramatic and unfeigned physical deterioration. A clean bill of health in a report of a medical examination does not make a sick man well; it has no curative properties. The substantial evidence lacking to support the action of the Correction Board is not supplied by the testimony of defendant’s medical expert, which itself was not based upon a consideration of all of the evidence in the record and rests upon a speculative theory of questionable medical validity discountenanced by opposing expert testimony and by the overwhelming weight of the medical and nonmedical facts before the court. The deceased should have been retired for physical disability as of April 27,1946.
FINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Vital statistics. Plaintiff is the widow of Lieutenant Colonel James S. Smith, who was bom April 1,1907 and died May 17,1958.
2. Service history.
(a) In June 1930, after four years of KOTC training at the University of Vanderbilt Medical School, plaintiff’s husband was, upon graduation, commissioned a First Lieutenant in the Army Medical Corps Reserve. He engaged in private medical practice from 1935 to March 1941. During this period he performed active military duty in the reserves for a month in 1934 and for about 11 months in 1935. He was called to active duty on March 1, 1941, and at that time was in good health.
(b) He arrived in the Philippines on November 2Q, 1941, where he served with the 71st Infantry Division of the Philippine Army as field surgeon stationed at Bataan. He was *555 captured by the Japanese on April 9, 1942, and remained a prisoner-of-war from then until September 12,1945.
(c) He was awarded a Bronze Star Medal for meritorious service in connection with military operations against the enemy during the two months prior to his capture, and received other decorations, including three Bronze Service Stars.
(d) Subsequent to his release from active duty on April 27, 1946, he joined the Florida National Guard in which he served on three two-week summer training tours in 1948, 1949 and 1950 doing nonphysical administrative duties. He was transferred to the Retired Reserve on November 25,1954.
3. Philippine experiences.
(a) As a medical officer with the American forces in Bataan during the period prior to capitulation to the Japanese on April 9, 1942, the deceased underwent many privations, suffering the stress of enemy action and acute hunger (daily ration of about 10 to 12 ounces of rice). Many of the Ameri-ican soldiers on Bataan contracted malaria and tropical diseases. On or about January 10, 1942, the deceased suffered lacerations of the left hand and multiple body contusions caused by the explosion of a Japanese bomb in Bataan, but this is not directly relevant to the present claim.
(b) The deceased participated in the so-called “death march” of the Bataan survivors to Camp O’Donnell, which involved a trek of about 165 miles in approximately 13 days, during which time the prisoners received food only on one day, the ninth. Instances of brutality inflicted en route on the weakened captives by the Japanese were commonplace. The deceased witnessed such atrocities as men being shot in the head for faltering, or being buried while half-alive, or being pushed off into the ditches to die. In one instance, witnessed by deceased, a soldier who had been shot by a Japanese guard was buried while he was still alive and his arms were sliced off by the guard while the soldier tried to extricate himself from the grave. These instances are related because they are relevant to the psychological trauma which the deceased suffered. During the death march the deceased was struck heavily over the right kidney with the *556 butt of a rifle wielded by his Japanese guard.[1] For the following two or three weeks he had gross hematuria (blood in the urine).
(c) Conditions for the prisoners at Camp O’Donnell, and later at Cabanatuan in the Philippines, were deplorable.[2] Hundreds of prisoners died daily. Nutritional diseases and dysentery were prevalent. Food was grossly insufficient and the men were reduced to eating insects to maintain life. The deceased served as Chief of Medicine for at least part of the time. His weight dropped from 190 down to 125 pounds. As a result of avitaminosis (vitamin deficiency) the deceased developed wet beriberi and temporary scurvy in 1942, and slight pellagra and partial night blindness in 1945. In addition, he suffered from hypoproteinemia (abnormal protein decrease in blood) and experienced bacillary and amoebic dysentery during the first year of his captivity, associated with severe abdominal pain, fever, and blood and mucous in his stools. Amoeba were found in his stools in January 1945, for which he was given carbarsone therapy. From 1943 to 1945 he had several attacks of kidney colic, and passed a stone from the left kidney in 1943. Throughout his imprisonment and for six months thereafter the deceased had marked edema of all dependent portions of his body, probably caused by beriberi.[3] His limbs were badly swollen. Despite these physical ailments the deceased attended to his official medical duties in the prison camps and administered to the sick and dying.
4. Physical examination on liberation. On September 14, 1945, immediately after his liberation, the deceased had a cursory physical examination in Manila which he described in 1951 as not being held in a hospital but “they ran you through a line”. The report of the examination mentions his chronic dysentery and beriberi in 1942-43, and his two attacks *557 of renal (kidney) colic. It recommends “rest and recuperation” as corrective action. The part of the form calling for a statement as to whether he was or was not permanently incapacitated for service was not filled in. His blood pressure was recorded at 120/76 and his weight at 149% pounds. No abnormalities were noted.
5. Brooke General Hospital.
(a) On October 23, 1945, the deceased was admitted to Brooke General Hospital, Fort Sam Houston, Texas, on transfer from Letterman General Hospital in San Francisco, where he had arrived on his return from overseas. The cause of admission was stated to be “Malnutrition, moderate, due to inadequate diet while a Japanese prisoner of war * * *.” The working diagnosis or impression was entered as “Post captivity Marasmus”, a term defined in Dorland’s Medical Dictionary, 23d Ed., as “progressive wasting and emaciation”. At the time of his admission he appeared to the examining physician to be a well-developed, moderately well-nourished man whose appearance was older than his 38 years. He was not then in acute pain, and reported that he had gained weight rapidly since returning from captivity, but tired easily after moderate exertion.
(b) At this time the deceased was anxious to return home and to resume his professional career. He was given a three-months convalescent sick leave, effective October 24,1945, and left Brooke General Hospital for home. While home he reserved office space in Miami, Florida, in November 1945 with the intention of resuming his practice.
(c) He returned to Brooke General Hospital on December 8,1945, prior to the expiration of his sick leave for the stated purpose of expediting his Army discharge so that he could get back to work. He underwent medical examination and tests from December 10 to 13,1945, with largely negative results. Amoeba noted in his stools the first day were not seen thereafter. His kidneys were found to be of normal size, shape and position with no abnormal calcifications noted. No abnormalities were observed with respect to blood pressure, EKG, chest, urine and blood, except that his blood urea nitrogen read 25 instead of a normal range of 10-15, and his heart *558 tones were of poor quality, and tbeir sound was “distant and poorly beard”, but without murmurs or thrills. In 1951 the deceased expressed his opinion to the Veterans Administration that, except for the eyes, Brooke General Hospital gave him a “pretty good examination although they ran through it pretty fast”. A medical witness for plaintiff testified at trial that, in the light of the numerous physical ailments which the deceased suffered during his imprisonment, he felt that it would take more than the “simple physical examination” he was given at Brooke General Hospital to evaluate the deceased’s condition at the time. Deceased was discharged on December 13,1945 by the Brooke General Hospital with the diagnosis “No disease, observation for Malnutrition”.
(d) A Disposition Board at Brooke General Hospital on December 17, 1945, entered a diagnosis of “Observation for disease — no disease found” and recommended that deceased be returned to general military service status. The “brief clinical abstract” attached to the Disposition Board action recited briefly the conditions from which the deceased suffered during his imprisonment by the Japanese. The report of the terminal physical examination made on December 19,1945 recited deceased’s medical history as follows:
Was Jap. Prisoner of War for 41 months. Beri Beri, scurvy, night blindness, pellagra, dysentery, amoebic and bacillary. Malnutrition, still fatigues. Amoebic dysentery and bacillary dysentery while a prisoner. No symptoms at present.
The report gave the deceased’s weight and blood pressure at the time as 169 pounds and 130/80, respectively. There were no abnormalities noted and he was found not to be permanently incapacitated for general service and to be eligible for discharge. He was placed on terminal leave from December 20,1945, and was relieved from active duty on April 27, 1946 under the provisions of RE 1-5 (Demobilization). After his release he returned to Miami where he arranged to resume the practice of medicine. Deceased told his wife at the time that he was not going to tell the hospital everything about his physical condition because he was anxious to return to his practice.
*559 6. Physical and mental condition at and after discharge.
(a) Three doctors, a dentist, two nurses (including deceased’s widow, the present plaintiff), and a pharmacist testified as to their observations of the deceased’s condition before and after his military service. These witnesses knew the deceased intimately for varying periods of time from as early as 1931 up until the time of his death. They were associated with him in medical practice directly or indirectly, or served biro in a medical capacity, and all of them had excellent opportunities to observe his physical and mental condition at various periods. The effect of their testimony is given in succeeding paragraphs of this finding.
(b) Prior to his departure for the Philippines the deceased was exceptionally vigorous, active and healthy. He was a successful and hardworking general practitioner and surgeon with an active practice which kept him occupied for 14 to 16 hours daily. He was never sick. His Army physical examinations from 1928 to 1941 corroborate that he was physically qualified for active duty as a commissioned officer at all times.
(c) Upon his return to Miami in 1946 he had aged in appearance considerably beyond his 39 years. He looked a sick man, with an unhealthy pallor and poor complexion contrasting with his ruddy complexion before the war. He had poor muscle tone and was flabby, especially around the eyes. He had noticeable edema in his hands, feet and ankles and wore special shoes because of the swelling. He had a shuffling gait in contrast to his vigorous gait before the war. He was shaky and short of breath, and complained of feeling weak. Because of this he could not engage in physical activities such as swimming, playing ball, or mowing the lawn. He had difficulty in sleeping without drugs. In contrast to his jolly prewar personality he became irritable, anxious and apprehensive, and avoided social and professional activities which he had previously enjoyed. He spoke slowly in contrast to his vigorous manner of speech before the war. In 1948 he was given a special chair with wheels so that he could propel himself around his office, for he was too tired to do unnecessary walking. He was sexually impotent from the time of his release.
*560 (d) From about April 1949, or earlier, to 1950 he developed other symptoms such as recurrent dizziness and headaches, migratory arthritic swellings of the joints, and severe, recurring, abdominal, epigastric pain for which he wore a corset in 1952. He complained of constant abdominal cramps ever since the time of his discharge.
7. Self-treatment. Prior to his release from active duty the deceased had received no treatment from the Army for any of the conditions from which he suffered during imprisonment by the Japanese. As a physician he treated himself.
8. National Guard, Fitness Examinations, 1947-191/8. In March 1947 and July 1948 he was given routine physical examinations by the National Guard and was found to be physically qualified to retain his commission. On these occasions his blood pressure was found to be 124/82 and 114/76, respectively, and his weight was 170 and 185 pounds, in the same order. No abnormalities were noted. An electrocardiogram was waived in the 1947 examination and there is no indication that one was taken in the 1948 examination.
9. Yanderbilt Examination, 191$. In August 1949 he was admitted to Vanderbilt Medical School for a checkup. Most of the medical record of his examination there is in virtually indecipherable handwriting. The gist of the report seems to be that diagnosis of his condition was difficult. Various possibilities were explored as the cause of his recently developed hypertension, arthritis and abdominal pain, including adrenal tumor, pancreatic lithiasis, etc. The notation on the electrocardiogram, which was taken on August 12, 1949, states “Left ventricular hypertrophy. Record suggests myocardial disease.”
10. Application to VA for disability compensation, 191$. By September 1949 the deceased’s condition had deteriorated and it affected his ability to carry on his obstetrical practice. On September 28, 1949, he filed an application with the State Service Officer of the Veterans Administration for disability compensation stating his disability to be “Hypertension, nerve tension — possible recurrent amoebic dysentery— All began about June 15, 1949.” In this application he stated his “entire income per month” to be about $3,000, but *561 in another place stated his “earnings” to be $1,000 per month, so it is difficult to determine whether the larger figure is a gross income figure.
U. Private consultations, 191^8-1952. From 1948 to 1952, with the discovery of high blood pressure (190/100), the deceased consulted and was treated by private physicians. A cardiologist, Dr. Dale Groom, pronounced deceased to be a “very ill man” suffering from advanced hypertension and congestive heart failure. An ophthalmologist, Dr. Joseph Groom, found evidence in deceased’s eyes of very serious progressive hypertension with a statistical life expectancy of five years.
12. VA examination, January 1950. On December 7,1949, the deceased was examined at the Veterans Administration Eegional Office in Miami, Florida, and was hospitalized at the Veterans Hospital at Coral Gables for examination from January 12 to 26, 1950. He stated that since April 1949, or perhaps earlier, he had suffered from dizziness, insomnia, headaches, and severe abdominal pains, that he had never felt completely well since his discharge from the Army, and that he had had to cut his medical practice 50 percent since about April 1949, due to his physical condition. A blood pressure of 200/120 was noted. He was stated to be healthy in general appearance, and normal with respect to nutrition, muscular development, carriage, posture, and gait. It was noted during the physical examination that the deceased’s heart was slightly enlarged to the left, and that there was a painful swelling of the right wrist with limitation of all movement. He was given a genito-urinary “workup”. A final diagnosis was made of “hypertensive heart disease with left ventricular hypertrophy, Class I.” The cause of his abdominal pain was undetermined, “probably due to spasm”. The joint pains were diagnosed as “Arthralgia, recurrent, probably due to gout”.
■13. First refusal of VA disability compensation claim¡ September 1950. On May 26, 1950, the Veterans Administration Eating Board at the Miami office requested that an advisory opinion be obtained from the Veterans Claims Service. The Eating Board’s comments as to the deceased’s *562 claim were markedly sympathetic and indicated its feeling that the sharp contrast between deceased’s prewar and postwar condition demonstrated rather conclusively that the impairment was the consequence of his drastic experiences during imprisonment, and that in some unknown way the medical diagnoses had not established the link. The report provided an hypothesis in explanation of the normal blood pressure readings at and for several years after deceased’s liberation (i.e., suppression of pressure readings due to severe malnutrition effects, dysentery, exhaustion, fluid and salt losses, avitaminosis), and suggested a connection between the trauma to deceased’s kidney sustained on the “death march” and his eventual hypertension state. The Rating Board stated that “It would also seem that this man’s disabilities were evaluated by the various doctors singly and that his case has not been fully appraised medically as a whole.” One of the three members of the Rating Board was a physician. The Adjudication Officer of the Veterans Administration regional office in Miami forwarded the Rating Board’s report to the Veterans Claims Service in Washington with his opinion and recommendation that service-connection should be granted because “no direct evidence is shown that could have caused the veterans’s hypertension other than tha injury to one of his kidneys while being a POW”. On July 19, 1950, the Veterans Claims Service denied deceased’s application, suggesting, however, that the records of Letterman and Brooke General Hospitals be examined for evidence that might warrant a finding of service-connection. On September 20, 1950, the Rating Board found that the deceased’s hypertension was not service-incurred or aggravated because it “was not manifested during service or within the presumptive period to warrant service connection” under applicable standards. It found that his amoebic dysentery and avitaminosis were service incurred but rated only 0 percent disability from September 30,1949. The deceased appealed the decision on October 7,1950.
14. Mayo Clinic, fall 1950. The deceased’s private physicians recommended surgery at Mayo Clinic for his severe hypertension. As a patient at Mayo from October 9, to November 21, 1950, the deceased underwent an extensive thora- *563 columbar sympathectomy on the left and right sides. In this type of operation (known as a “Smithwick”), which is used only in cases of advanced hypertension to prolong life, certain sympathetic nerve routes along the spine causing spasm and elevated blood pressure are sectioned in order to lower the pressure. The deceased tolerated the operations poorly and suffered heart failure after each stage. The clinic stated that the connection between the deceased’s poor postoperative state and the possibility of permanent damage from beriberi heart would necessarily be conjectural. On admission to Mayo Clinic the deceased’s blood pressure was 185/122, and upon discharge it was 165/108 (prone) and 115/80 (standing).
15. Hospitalization at Coral Gables, winter 1950-1951. On December 1,1950, deceased was admitted to the Veterans Administration Hospital at Coral Gables suffering from shortness of breath and other complaints. He remained until December 23,1950, and subsequently reentered and remained there from January 2 to February 27,1951. Examination disclosed the heart to be markedly enlarged to the left. The impression on first admission was hypertensive disease of the heart. The narrative summary states the following:
* * * we are faced with the fact that despite our therapy, there still remains a great dilatation of the heart. "Whether this is due to his hypertensions or whether this is due to an underlying beri beri. disease secondary to his marked avitaminosis and malnutrition while a prisoner of war cannot be determined. It seems that perhaps his hypertension has precipitated this mild congestive failure that he demonstrated during hospitalization due to underlying beri beri heart disease. It is difficult for the various examiners to believe that the marked cardiac dilatation is secondary to this patient’s hypertension. It is felt in general that this cardiac dilatation has occurred too rapidly for that usually seen with the hypertrophy and dilatation to that seen with hypertension. The hypertension in this case is of 3-4 years duration. * * *.
The final diagnosis was:
1. Disease of the heart.
A. Etiology — hypertension.
B. Anatomical — left ventricular enlargement and dilatation.
*564 C. Manifestation — regular sinus rhythm and minimal congestive failure.
D. Capacity for work — class IY. [i.e., 10%].
2. Pulmonary fibrosis, secondary to old decompensation.
3. Nephrosclerosis.
The report concluded with the statement that the disability was non-service connected.
,16. Curtailment of post-war practice. Despite his eagerness to resume practice after his release, the deceased was physically unable to work fulltime for about six months afterwards. He then tried to catch up the lost years by pushing himself beyond his physical capacity. Because of his condition he had to relinquish his surgery specialty by referring such cases to others. He limited himself to obstetrics. Even with the help of associated doctors and nurses the deceased had to curtail his professional activities after about two years because of his physical condition, and by April 1949 his practice had been reduced 50 percent. From November 1949 to June 1950 the deceased could not work at all, and from then to his death in 1958 he could work at his office only about two hours a day.
17. Second refusal of VA disability compensation claim, March, 1951. On March 20, 1951, the YA Bating Board in the Miami office again rejected deceased’s reopened claim for disability compensation. On this occasion it gave consideration to the reports of the Mayo Clinic and the Coral Gables Veterans Hospital (findings 14 and 15, supra), which latter diagnosed hypertensive heart disease, pulmonary fibrosis, and nephrosclerosis. These diagnoses were different from the diagnosis of hypertension which the Bating Board had previously found to be non-service-connected, but the Bating Board found the new conditions to be merely a progression of the hypertension previously denied, and so adhered to its ruling. However, deceased was notified on April 3,1951 that a formal hearing on his appeal would be held on April 17, 1951.
18. Board of Veterans Appeals hearmg and reference, April 1951. On April 17, 1951, a hearing was held before the Bating Board in lieu of a hearing before the Board of Veterans Appeals on deceased’s appeal. The deceased, and *565 a representative of a veterans organization on bis bebalf, appeared and presented the plaintiff’s contentions. On April 19, 1951, the Rating Board appointed a board of two heart specialists to determine “if avitaminosis (beri beri) is a factor in veteran’s heart condition as well as hypertension”.
19. Report on special cardiac consultation, May 1951. On May 8, 1951, two heart specialists examined deceased as directed by the Veterans Administration Rating Board. Their report gave as their impression of the deceased’s condition the following:
(1) Hypertensive cardiovascular renal disease.
(2) Cardiac hypertrophy and dilatation, particularly involving the left ventricle.
(3) Chronic congestive heart failure, at present mild.
(4) Nephrosclerosis.
(5) Pulmonary fibrosis.
The report also stated in pertinent part:
The first point for discussion concerns the question whether beriberi is a factor in the veteran’s present heart condition. We believe that heart damage was produced in this patient at the time that he developed his beriberi as a prisoner of war. * * * It is quite conceivable that this patient was left with some residual unrecognized myocardial damage which was not detectable until an additional factor, namely, the hypertension, uncovered the latent myocardial damage. * * *
The second point for discussion is the possibility of the hypertension resulting from the physical and emotional trauma incurred while a prisoner of war. This point can be neither proved or disproven. However, the examiners lean toward the opinion that a causal connection does exist between the physical and mental traumata and the present illness. This patient has been exposed to as severe physical and emotional experiences as is consistent with retention of life. * * * The fact that the blood pressure was normal at the time of release from service is no contra-indication to the connection between the present hypertension and the experiences, since he was at that time only recovering from severe malnutrition and other debility states, and he never fully recovered, in fact, even when in civilian life to his previous state of well being. * * *.
In summary these examiners believe that there is a possible and even probable connection between the pres *566 ent illness of this patient, hypertensive cardiovascular renal disease and the physical and emotional traumata experienced while a prisoner of war. It is likely that the degree of heart involvement now noted is referable to the previous damage of his heart. It is possible too that he has incurred a hypertensive disease as a result of renal and other damage incurred while a prisoner of war.
20. Ultimate Veterans Administration decision, May 1951. On May 3, 1951, the Sating Board of the Veterans Administration, based on the hearing (finding 18) and report of the heart specialists (finding 19), reversed itself and decided that the deceased’s hypertension and cardiovascular renal disease had their origin in the emotional and physical trau-mata resulting from his experiences in the Bataan “death march” and subsequent experiences as a prisoner-of-war. Specifically, the board granted deceased service-connection for hypertensive heart disease with chronic congestive failure and pulmonary fibrosis, with a rating of 20 percent disability from September 30, 1949, the date of his application, to January 11, 1950, 30 percent from January 12, 1950 to November 30, 1950, and 100 percent from December 1, 1950. He was also rated 10 percent from December 1, 1950, for nephrosclerosis directly due to and proximately the result of his service.
21. First and second Correction Board proceedings, 1953 and 1956.
(a) On May 14, 1953, and again on November 20, 1956, the deceased applied to the Army Board for Correction of Military Kecords (hereafter referred to as the Correction Board) to have his records corrected to show him retired by reason of physical disability. The first application was presented on deceased’s behalf by the American Legion and the second by the Veterans of Foreign Wars. There were before the Correction Board all evidence contained in the deceased’s claim file before the Veterans Administration. In either or both of these two applications the deceased stated that enough time had not elapsed prior to his discharge to show or evaluate his disabilities, that he was totally disabled and had been so rated by the Veterans Administration, that he felt worse *567 all the time since returning from overseas, and that he desired to appear before the Board “if necessary”, but did not desire to have witnesses appear (at his own expensé). ■ The Correction Board concluded as to each application that there was no justification for a formal hearing and review of the case by the Board.
(b) On August 5, 1954, the Correction Board requested “comment and opinion” from the Surgeon General as to whether at the time of his discharge in April 1946 the deceased had sufficient disability to warrant disability retirement, and asked “detailed comment” as to whether the hypertensive heart disease adjudicated by the Veterans Administration to be service-connected could be the result of his experience as a prisoner-of-war and, if so, what resultant symptoms were present at the time of his discharge. The Correction Board furnished the clinical records of the Veterans Administration to the Surgeon General. On August 19, 1954, the Correction Board was advised by a representative of the Surgeon General that the evidence did not support the deceased’s claim to physical disability retirement, and that not only was there no clear evidence of hypertensive heart disease in the deceased in 1946 but that it was not possible to state what effect the deceased’s experience as a prisoner-of-war might have had on his eventual hypertensive heart disease since the cause of that disease “is not known”.
(c) On September 20, 1954, the Correction Board denied plaintiff’s first application and on February 19,1957, it denied his second application. There was no oral hearing granted or specifically requested as to either of the two applications. The denials by the Correction Board and the opinion rendered by the representative of the Surgeon General (paragraph (b) of this finding) purportedly were based on an examination of whatever evidence was available, but they do not specify precisely what evidence was considered, nor do they discuss the details of the evidence which led to the conclusions expressed.
22. Treatment and death at Cleveland Clinic, 1958. Between 1950 and 1958, despite medical attention and the use *568 of various antihypertensive drugs,[4] the deceased did not improve. He could not contain his hypertension and sustained intermittent cardiac failure. Finally, upon the recommendation of a private physician, the deceased entered the Cleveland Clinic on April 28, 1958. There, because of findings of extensive renal arterial occlusive disease, he was operated on to explore the right kidney. He died on May 17, 1958, three days after the operation. On admission to the Cleveland Clinic the deceased’s blood pressure was 225/100. Examination showed a 36 percent enlargement of his heart, a marked disparity in the size and function of his kidneys (the right kidney was 6 cm. in length v. 13 cm. for the left kidney), and an impairment in both. Because of the abrupt appearance of the dehypertension in 1948 or 1949 the Cleveland Clinic considered the possibility of occlusive disease of the renal artery. In attempting to get a history of the flank pain which might have suggested this type of disease, the attending doctor was told by deceased of the wartime blow to his right kidney. It was discovered upon operating that the left kidney had considerable collateral blood supply, but the left renal artery was obliterated because of severe atherosclerosis. The pathological report of the autopsy stated:
Necropsy discloses a surgically absent right kidney with a 1500 ml. hematoma in the right paratoneal gutter. Review of the kidney sections discloses marked arteriolar as well as arterial nephrosclerosis on the right. Severe arterial and arteriolar sclerosis is present in the numerous other organs. The left kidney is remarkable in that the main renal artery is obliterated by atherosclerosis of its ostium, complicated by organized thrombus. His-tologically the kidney is virtually unremarkable, having apparently been maintained by a well demonstrated abundance of small collaterol vessels. Arteriolar sclerosis is of insignificant degree in this kidney by contrast with its mate. From this one postulates the initiation of hypertension on a functional basis, complicated sub *569 sequently by both arteriosclerosis and arteriolar sclerosis, the former process preceding the latter in the left kidney at least, thereby reducing arterial pressure locally and sparing the arterioles. There is marked left ventricular hypertrophy and endocardial _ sclerosis, attributed to severe and prolonged hypertension. Evidence of chronic pulmonary congestion suggests repeated episodes of left ventricular decompensation. Death was attributed to left ventricular failure, precipitated by operative stress.
The diagnosis in the autopsy report stated:
DIAGNOSIS
DECENT RIGHT NEPHRECTOMY
15 0 0 CO. HEMATOMA, EIGHT GUTTER _
_ MARKED ATHEROMATOSIS OF AORTA WITH OCCLUSION OF LEFT RENAL ARTERY (MaiN)
Grossly Normal KidNey Maintained by Anastomotic Blood Vessels
THROMBOTIC OCCLUSION, RECENT, LEFT COMMON ILIAC ARTERY
MARKED LEFT VENTRICULAR MYOCARDIAL HYPERTROPHY Focal Fibrosis
LEFT VENTRICULAR DILATATION
Endocardial Fibroelastosis, Leet Ventricle, Secondary
23. Third application to Correction Board, 1959.
(a) On August 12,1959, the deceased’s widow (the present plaintiff) made application to the Correction Board, and with her application submitted medical records from Vanderbilt Hospital, Mayo Clinic, Veterans Hospital at Coral Gables, and the Cleveland Clinic, together with statements from physicians, nurses and other professional persons who had close association with the deceased. The widow stated in her application that she desired to have witnesses appear in person “if necessary”, including herself (at no expense to the Government). No hearing was actually held because the Correction Board felt that no material evidence of error or injustice was shown to warrant a hearing, although no comment was made by the Board as to the new evidence which had not been before the first two Board proceedings.
*570 (b) On November 23, 1959, the Correction Board again requested the representative of the Surgeon General for a comprehensive opinion and such other comments as might be helpful in adjudication. In his response of February 5, 1960, the representative of the Surgeon General reaffirmed the previous advice that the deceased was not entitled to disability retirement at the time of his discharge in 1946, and stated in part as follows:
3. It is quite possible, even probable that Lt. Col. Smith’s POW experience did exercise some effect upon the development and/or progression of hypertension and its attendant complications first noted about 2 years following separation and rapidly progressing to a fatal termination on 17 May 1958. While this factor may have been the basis for a grant of service connection by the YA for compensation purposes, it does not affect the established fact that Lt Col Smith, by the evidence of record was medically fit to continue in the active military service in April 1946. Although the compassionate aspect of disability or death developing subsequent to service in ex-POWs exposed to hardship and disease is appreciated, the basic law governing eligibility for disability retirement requires that a member be found medically unfit while in the active service and not during a subsequent period, irrespective of the date or circumstances of origin of the disabling condition.
The report does not discuss the evidence in the case but advises only as to broad conclusions.
(c) Upon being advised of the comments of the representative of the Surgeon General described in the preceding paragraph, the American Legion (which was representing the plaintiff) wrote to the Correction Board urging the merits of the claim and requesting permission for the widow to appear in person before the Board. The American Legion stated that “There is no question that this man could not have carried on his duties had he stayed in service.” The Legion enclosed a copy of a letter dated July 8, 1959, from the Mayo Clinic, referring to the deceased’s failure to recover his strength after 1946 and mentioning his heart failure at Mayo as possibly caused by beriberi.
(d) On May 26, 1960, the Correction Board denied plaintiff’s application without a hearing.
*571 24. Clash of expert opinion. Dr. Dale Groom and Lieutenant Colonel Kobert C. Jones were the principal medical witnesses called for plaintiff and defendant, respectively, on the issue of whether the deceased was physically qualified for active duty at the time of his discharge in 1946. They were both highly qualified in the relevant medical field. The complex reasons for their diametrically opposing views justify a detailed report. In the following findings 25 and 26 the views expressed are those of the witnesses, and not of the court.
25. Dr. Groom,.
,(a) Dr. Groom is a specialist in cardiovascular diseases on the faculty of the Medical College of South Carolina. He served as a medical officer in the Navy 1944-1945; in the Mayo Clinic, 1946-1949; and practiced privately in Miami from 1949 to 1953, when he assumed his post at the Medical College.
(b) Dr. Groom treated the deceased from 1949 to 1952 and considered him in 1949 a “very ill man”, depressed and withdrawn. At that time the deceased had hypertension of advanced degree and congestive heart failure. Dr. Groom advised the deceased to have the sympathectomy at Mayo Clinic in 1950 in an endeavor to lower his blood pressure to prolong his life (finding 14). When the deceased returned to Miami after that operation he was in one of the later stages of congestive heart failure, as shown by his pulmonary edema (severe congestion of the lungs), which required him to remain in an oxygen tent for a protracted period in early 1951 at the Veterans Hospital at Coral Gables (finding 15).
(c) Dr. Groom gave considerable thought to the probability of a kidney condition being the cause of the hypertension and a pyelogram test made by him indicated an abnormality. Wet beriberi, which the deceased contracted during his wartime imprisonment due to nutritional deficiencies, involves the heart and causes congestive heart failure, irrespective of hypertension and long before the latter became evident. Beriberi decreases the flesh in the heart and causes pulmonary fibrosis, the diagnosis given deceased at Coral Gables in December 1950-January 1951.
*572 (d) In addition to heart disease the deceased also had hypertension, which Dr. Groom felt could have been caused by the beriberi or by the blow to the deceased’s right kidney. The medical records of the deceased’s last illness and operation at the Cleveland Clinic in 1958 (finding 22) indicate a very small contracted right kidney which could well have been the result of a scarring or cicatrical process, with the kidney scars contracting over the years (finding 3(b) relates that the deceased suffered from blood in his urine for two or three weeks in 1942 as the result of being struck by a rifle butt in the kidney during the Bataan death march). Autopsy revealed advanced hypertensive changes in the deceased’s right kidney. Earlier, in January 1950, an advanced stage of hypertension was shown by examination at the Veterans Hospital in Coral Gables which disclosed left ventricular hypertrophy, a classical sign of advanced hypertension. At that examination an abnormality in the configuration of the right kidney was also noted as having been discovered at the Vanderbilt Hospital in 1949, although the same condition was not detected at Coral Gables. This abnormality is a condition which interferes with the collecting function of the kidney.
(e) Until sometime in early 1949 the available records of deceased’s blood pressure reflect normal pressures from the time of his terminal physical examination in 1945. While this condition is a contra-indication of hypertension, it is recognized that high blood pressure can be masked by severe debilitating diseases such as beriberi and other nutritional diseases which the deceased had during his imprisonment. The deceased had “acquired” as distinguished from “essential” hypertension, as shown by the suddenness of its onset and the absence of family history of hypertension. “Acquired” hypertension implies a cause.
(f) The pronounced enlargement of the deceased’s heart as disclosed at autopsy indicates that previous damage to the heart by beriberi contributed to the enlargement which is naturally produced by hypertension.
(g) The deceased’s experiences and ailments while a prisoner-of-war, and his complaints of fatigue after his liberation justified a more thorough terminal physical examination *573 than be was given in December 1945 at Brooke General Hospital (finding 5).
<26. Dr. Jones.
(a) Lieutenant Colonel Jones of tbe Army Medical Corps is Assistant Chief of Cardiology at Walter Need Hospital. Besides bis one year internship be bad three years residency in internal medicine, two years residency in cardiology, approximately 12 postgraduate training courses at various universities, and be is certified by tbe American Board of Internal Medicine.
(b) Based largely on tbe results of the deceased’s terminal physical examination at Brooke General Hospital in December 1945, as augmented by certain other incomplete medical records, including tbe results of the autopsy at Cleveland Clinic after death of the deceased in 1958, Dr. Jones concluded in general that (1) tbe deceased’s condition from the time in 1949 when hypertension was first diagnosed was psy-choneurotic in origin and was not physically related to or the consequence of his wartime malnutritional diseases or experiences, and (2) the hypertension which the deceased developed in 1949 was due to a non-service-connected kidney disorder which had no causal relationship to the blow to the right kidney or the beriberi which the deceased suffered during the war.
(c) An indispensable basis of Dr. Jones’ opinion was the adequacy and accuracy of the terminal physical examination at Brooke General Hospital in December 1945. The report of this examination, which was conducted over a three-day period, shows the following:
(1) Ophthalmoscope examination of deceased’s eyes showed normal fundi, meaning that there was no evidence there of disease involving the blood vessels, which in turn ruled out the existence of hypertension at that time.
(2) The heart was not enlarged and the EKG was normal, which also were factors negating hypertension.
(3) The kidneys were then of normal size, shape and position, indicating that there was at that time no evidence of mechanical injury to either kidney.
*574 The deceased’s blood count was normal, whereas if he had had severe hypertension and kidney disease he should then have been anemic.
Pulse was full and regular, indicating an absence of beriberi, which is characterized by a wide pulse. (Actually the pulse reading was 95, a greater than normal rate.)
Blood pressure was normal. o
Deceased’s heart tones were distant and poorly heard, a factor which Dr. Jones disregarded as being unimportant in the absence of other suspicious findings.
(d) Dr. Jones attached significance to the fact that a pye-logram (i.e., a test wherein dye is taken up by the kidney) taken in 1950 at the Veterans Hospital at Coral Gables showed no kidney abnormality, although this would not rule out kidney damage. He attached no significance to the secondary evidence of pyelogram results at Vanderbilt in 1949 purporting to show an absence of filling of the superior calyx of the right kidney, an abnormal condition. The reference appears only collaterally in the Coral Gables medical record, but the available part of the incomplete Vanderbilt record refers to a pyelogram having been taken there and does not state the result, so far as the Vanderbilt record is legible. In view of the established fact that hypertension was present in early 1949, and the fact that the autopsy in 1958 demonstrated to Dr. Jones’ satisfaction that it had its origin in a diseased kidney, it is not understood why the pyelogram in 1949 at Vanderbilt should show an abnormal kidney condition and the one in 1950 at Coral Gables does not, unless such tests are unreliable or were erroneously read.
(e) Dr. Jones’ chief contribution to the problem was his reconstruction of the origin and cause of deceased’s hypertension in the light of the autopsy report in 1958. Translated as simply as possible, it goes like this:
Each of the two kidneys receives its blood supply via its renal artery. The autopsy revealed that the deceased’s left renal artery was virtually closed up by atherosclerosis, this being a fatty deposit inside the artery. Sometime in 1949 or thereabouts the left renal artery became so badly congested *575 by atherosclerosis that the left kidney was receiving an inadequate supply of blood. This drop in blood pressure activated microscopically small structures in the left kidney known as baroreceptors. The activated baroreceptors automatically released a hormone known as renin. The renin combined with a liver hormone to produce in combination another hormone called angiotension, which is the most powerful known agent in the production of high blood pressure. In the case of the deceased the angiotension caused marked contraction of the blood vessels in order to create a blood pressure high enough to feed blood to the left kidney. Thus stimulated the left kidney developed collateral blood supplies, but in the process the right kidney was deprived of an adequate blood supply and withered away from a condition known as arteriolarsclerosis. Thus the left kidney initiated the whole pathological process resulting in the damage to the right kidney which, when removed at the Cleveland Clinic, was remarkably smaller than the left kidney. In this way Dr. Jones demonstrated his theory that the wartime blow to the deceased’s right kidney played no part in its ultimate destruction. He also said that the atherosclerosis which caused the blockage of the left renal artery in 1949 and the resulting hypertension was itself the result of a gradual buildup which had no causal relationship to the deceased’s wartime service. In fact, the starvation diet to which the deceased was subjected while a prisoner would tend to prevent atherosclerosis.
27. Reply to Dr. Jones.
(a) The views expressed by Dr. Jones were formulated on only part of the complete record. He did not examine or give weight to the following evidence which was before the last Correction Board and before the court:
(1) Symptoms not appearing in the Brooke General Hospital medical record of the terminal physical examination in December 1945.
(2) Deceased’s testimony before the Veterans Administration in connection with his successful application for disability compensation.
*576 (3) Statement of Dr. Bizzolo, who was a fellow-prisoner with deceased in the Philippines.
(4) A letter from a doctor at the Cleveland Clinic describing the terminal operation and autopsy.
(5) Opinion of the special cardiac consultants which led to the granting of disability compensation by the Veterans Administration.
(6) The record at the Coral Gables Hospital in 1950 showing enlargement of deceased’s heart and pulmonary fibrosis in 1950.
(7) The congestive heart failure at Mayo Clinic in 1950.
(b) There were certain contradictions or discrepancies in Dr. Jones’ analysis, viz:
(1) His opinion that the objective manifestations of the deceased’s condition from his liberation in 1945 to his hypertension in 1949 were “psychological scars, unaided by disease”, the “POW syndrome”, coupled with his opinion that the psychiatric condition would be service-connected and would make the deceased a useless officer, even though he was found fit for duty at the time of his separation. In this connection it is noted that the deceased was given a special neuropsy-chiatric examination in December 1949 at the Veterans Hospital at Coral Gables which found “There is no evidence of neuropsychiatric disease found on examination of this veteran at the present time.”
(2) His acceptance of the Brooke General Hospital finding in December 1945 of normality of deceased’s heart condition as a complete disproof of any permanent effects on the heart caused by beriberi.
(3) His disagreement with the Cleveland Clinic as to the immediate cause of deceased’s death in 1958.
(4) His constructive disagreement with the Vanderbilt doctor that comparison of the deceased’s EKG at Brooke General Hospital in 1945 with his EKG at Vanderbilt in 1949 suggested myocardial disease of the heart.
(c) After the close of trial the parties filed a stipulation consisting of written statements made by Dr. Groom and Dr. *577 Jones commenting on each other’s testimony. Dr. Groom’s statement reflects a detailed, examination of the record with respect to the opinion of Dr. Jones as to the causes of the deceased’s postwar ailments. In particular he challenged Dr. Jones’ reconstruction of the causes of deceased’s hypertension as described in paragraph (e) of finding 26. To condense Dr. Groom’s comments: Dr. Jones’ opinion that atherosclerosis of the left renal artery caused the deceased’s hypertension and eventual death is equally susceptible to the conclusion that deceased’s warbom hypertension accelerated his atherosclerosis rather than the other way around. There is as much reason to suspect that the deceased’s hypertension originated in the right kidney as in the left, and that it was precipitated in his right kidney from the scarring which stemmed from the blow to the right kidney during the deceased’s imprisonment. The results of the terminal physical examination at Brooke General Hospital in December 1945 which reported normal readings of blood pressure, heart, kidneys, etc., may have been the result of an inadequate examination, i.e., blood pressure readings were probably not made in both arms; the eyes were probably not dilated for the purpose of the opthamalogical examination so that hypertensive changes could be more accurately detected in the fundi. Dr. Groom thought that the deceased’s advanced stage of hypertension in 1950 strongly suggested the likelihood of the development of hypertension of a kidney origin over a period of at least a few years. Dr. Groom agreed with the Cleveland Clinic’s attribution of death to left ventricular failure, and disagreed with Dr. Jones’ speculation that it was caused by post-operative hemorrhage and shock. He relates the autopsy finding of “spectacular degree of subendocardial thickening” of the heart to deceased’s wartime dietary deficiencies (resulting in beriberi) involving factors not yet understood by the medical profession.
(d) In reply to the foregoing comments by Dr. Groom, Dr. Jones wrote the following statement for the record:
I have read Dr. Groom’s letter dated 27 May 1963. It is an excellent resume of the case. It is very difficult to argue points with the physician who actually took care of the patient and saw him through his illness. *578 Attempts on my part to reconstruct the exact details of all aspects of the case based on incomplete medical records of a patient long dead is fraught with difficulty.
My testimony and conclusions were based on records only. The points of argument Dr. Groom raises are all very logical but in each area treated are controversial. He admits to this in his letter.
Based on his letter, and in consideration of my previous testimony, I would see no reason to change my opinion. Further, a reopening of the case would serve no further purpose.
28. Conclusions. The deceased was permanently incapacitated for active military service at the time of his release in 1946. His incapacity and the causes thereof were incidents of his service. The decisions of the Correction Board to the contrary were not based on substantial evidence for two reasons. First, there is no satisfactory indication that they were based upon a balanced consideration of all the evidence available and presented. Where the medical issue is complex and in considerable dispute, and the Veterans Administration has previously found service-connection, a disposition of the claim for disability retirement by the Correction Board without a hearing and without an analysis of the evidence in writing is inadequate assurance that due weight was given to all of the evidence, both medical and nonmedical, even though the opinion may formally recite that it was based upon all of the evidence. Second, even if it were to be assumed that the Correction Board considered all of the evidence, the causes of the deceased’s physical disability at the time of his discharge, while not susceptible to precise diagnosis, even in the present state of medical knowledge, nevertheless existed and related to impairment of his heart, kidney and circulatory system as a direct but undetected result of his wartime deficiency diseases, kidney injury, and psychological trauma. The transformation of the deceased from a prewar condition of robust health to a postwar condition of broken health, in the total absence of causative factors other than his wartime medical history compels the conclusion that plaintiff was disabled when he was released from active service, despite some possible technical difficulty in reconciling medical laboratory findings of normal functioning with the over *579 whelming and uncontested proof of deceased’s dramatic and unfeigned physical deterioration. Hie substantial evidence lacking to support the action of the Correction Board is not supplied by the testimony of defendant’s medical expert, which itself was not based upon a consideration of all of the evidence in the record and rests upon a speculative theory of questionable medical validity discountenanced by opposing expert testimony and by the overwhelming weight of the medical and nonmedical facts which are before the court. The deceased should have been retired for physical disability as of April 27,1946.
Conclusion op Law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Buie 47 (c) (2).
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on May 3,1965, that judgment for the plaintiff be entered for $20,824.51.

 This incident was not mentioned officially by the deceased until his examination by the Veterans Administration in 1949 (finding 12), but its authenticity seems to be unimpeachable from evidence in the record.

 At some undisclosed time the deceased was transferred from the Philippines to Japan as a prisoner and confined there.

 Edema was not noted in his terminal physical examination in December 1945 (finding 5), but eyewitness’ proof in the record proves that the deceased had swollen ankles, puffy eyes, etc.

A pharmacist testifies that the deceased used such antihypertension drugs as Raudixin and Diarol right after his return to Miami in 1946. This is the only tangible indication that the deceased suffered from hypertension at any time prior to early 1949. Its significance, if any, is not noted by the parties. The same pharmacist supplied deceased also with B-Nutron (a liquid vitamin to build him up) and paraldehyde (to promote sleep).