Per Curiam:
This case was referred to Trial Commissioner Paul H. McMurray with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed October 15,1965. Exceptions to the commissioner’s report and opinion were filed by the defendant and the case was submitted to the court upon the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is therefore entitled to recover disability retirement pay from the day following the date of his release from active duty, less amounts received from the Veterans Administration, and judgment is entered for plaintiff to that effect with the amount of recovery to be determined pursuant to Rule 47(c) (2).
*1149 Commissioner McMurray’s opinion*, as modified by tlie court, is as follows:
This is a claim for disability retirement pay by a Naval Reserve officer who bad extensive combat duty in World War II. The record shows that plaintiff was a normal individual in early life.[1] The action is brought in this court after an application for a hearing before the Board for Correction of Military Records was denied. Section 4 of the Naval Aviation Personnel Act of 1940, 54 Stat. 864, 34 U.S.C. § 855c-l (1946), in effect at the time in question,[2] provided:
All officers, nurses, warrant officers, and enlisted men of the United States Naval Reserve or United States Marine Corps Reserve, who, if called or ordered into active naval or military service by the Federal Government for extended naval or military service in excess of thirty days, suffer disability or death in line of duty from disease or injury while so employed shall be deemed to have been in the active naval service during such period, and they or their beneficiaries shall be in all respects entitled to receive the same pensions, compensation, retirement pay, and hospital benefits as are now or may hereafter be provided by law or regulation for officers, warrant officers, nurses, and enlisted men of corresponding grades and length of service of the Regular Navy * * *.
Officers of the Regular Navy are entitled to disability retirement pay, if they are incapacitated for active service and the incapacity is the result of an incident of the service. 34 U.S.C. § 417;[3] Lemly v. United States, 109 Ct. Cl. 760 (1948) *1150 75 F. Supp. 248; Womer v. United States, 114 Ct. Cl. 415 (1949) 84 F. Supp. 651.
Prior to the formal trial of this case, defendant filed a motion requesting this court to dismiss the petition on the theory that the action was barred by the statute of limitations, the plaintiff having been found physically qualified for duty in 1945 by a Naval Board of Medical Survey. On November 15, 1963, this court held that the suit was timely filed, stating that plaintiff “did not ask for or appear before a Retiring Board at any time, nor was one offered to him.” Hoppock v. United States, 163 Ct. Cl. 87, 89 (1963).
On June 10, 1935, plaintiff enlisted in the U.S. Naval Reserve at the age of 17. The record shows that plaintiff was graduated from high school and won a scholarship to City College of New York, but preferred to seek formal preparation for admission to the U.S. Naval Academy at a school specifically conducted for that purpose. His status in the U.S. Naval Reserve was terminated when he entered the U.S. Naval Academy on July 8, 1938.
Plaintiff was graduated from the Naval Academy in December 1941, in the upper third of his class. He married his high school sweetheart shortly after graduation.
A Regular Navy commission was denied plaintiff because of a minor defect in one eye and defective vision which was corrected by glasses. On December 19, 1941, plaintiff was found physically qualified for a commission in the Naval Reserve with waiver for defective vision, and he was appointed ensign, USNR. He entered upon active duty on January 5, 1942, and served almost 4 years, until November 26, 1945, on which date he was released from active service at his request.
Upon entry into active service, and thereafter, plaintiff attended naval installations at Great Lakes, Illinois, Notre Dame University, Cornell University and Yorktown, Virginia, receiving instructions in the fields of Mine Warfare and Diesel Engineering.
Plaintiff’s first command was a mine sweeper, the YMS 287. While aboard that ship plaintiff saw combat in the Ellice, Gilbert and Marshall Islands, including the invasion of Tarawa. One of the duties personally performed by *1151 plaintiff while commanding officer of this ship was to locate and retrieve enemy mines, going out in a small dinghy, accompanied by his steward.
On January 8,1944, plaintiff was detached from the YMS 287, and at the age of 25, assumed command of the LST 213, an amphibious landing vessel, at Funafuti, Ellice Islands. Plaintiff’s first task, and one which he performed well, was the reorganization of the ship and the training of its crew. The ship had a company of 110 men and 8 officers, and could also accommodate approximately 400 Marines with full equipment and vehicles for landing operations.
Within a short period of time the LST 213 was transformed into a highly efficient ship, and the morale of the crew was changed from one conducive to desertion to one of pride in the difficult and dangerous job it had to perform. About this time, a formal request, approved by plaintiff’s superiors, was forwarded to the Bureau of Naval Personnel for a change of plaintiff’s status from a Reserve Officer to that of a Regular Navy Officer. The request was denied because of a technicality.
In its first combat operation, the LST 213 carried supplies to air bases in the Gilbert and Marshall Islands, often without escort and subject to air and submarine attacks. After this assignment, while the ship was being prepared at Pearl Harbor for the invasion of Saipan, an explosion occurred in the harbor one night and seven or eight neighboring ships were destroyed. A number of men known to plaintiff were killed.
In the invasion of Saipan, plaintiff’s ship carried first-wave troops, who were landed in the dark under an artillery barrage from offshore naval vessels. The proof indicates that a large number of men were killed in this operation. During the Saipan landing operation an explosion of high octane gasoline occurred on plaintiff’s ship. The cargo of high octane gasoline was for use by tanks and personnel carriers which were also carried on the ship. During the remainder of the invasion of Saipan plaintiff’s ship transported cargo from other ships or land stations to the shore and patrolled the beaches at night, rescuing men and salvaging supplies. Protection of the vessel and the men it carried *1152 was, at times, insignificant, in view of the constant air and submarine threats.
After the invasion of Saipan the LST 213 was ordered to carry first-wave Marines and their equipment for the assault landing on Tinian. That operation was similar in nature and involved equal danger to ship and men as experienced in Saipan. Following Tinian, plaintiff’s ship was ordered to participate in the invasion of Leyte, landing first or second assault wave personnel and transporting supplies, including ammunition and gasoline, from supply ships to the beach. During this operation the ship underwent so many air attacks it was difficult to log them. Twenty-six attacks occurred in the space of 1 hour, and the ship took a toll of five Zeros and one Japanese bomber. During the unloading of supplies on the beach at Leyte, a huge ammunition dump, within 400 or 500 yards of plaintiff’s ship, was struck by enemy fire and exploded. The concussion pushed the 5,000-ton ship sideways and knocked almost every man on board off his feet. One man was permanently deafened by the roar; exploding ammunition sailed over the ship for more than an hour, striking vessels beyond. The ship was reported missing at the time. It was also during this landing that the Japanese naval power was destroyed in the Leyte Gulf where the U.S. fleet concentrated its fire power on each J apanese .vessel entering the gulf with guns trained on U.S. ships on the beach, including the LST 213, left for decoy.
Leaving the Gulf of Leyte, the LST picked up 212 survivors while under constant Japanese aerial attacks. Once at sea, the ship encountered a typhoon which produced waves more than JO feet in height. The typhoon has been credited with causing more damage to the U.S. ships than caused by the Japanese fleet.
The last mission of the LST 213 under plaintiff’s command was during the battle of Luzon in the Lingayan Gulf. Because of hull trouble the ship did not land first-wave personnel, but its crew and officers witnessed and were subject to kamikaze attack by J apanese boats carrying explosives on their bow. At the landing, the LST 213 collided with another ship and fire broke out.
*1153 Plaintiff’s performance as commanding officer of the YMS 287 reflected both competence and bravery; the same type of performance was continued by plaintiff as the commanding officer of LST 213 until sometime after the landing at Saipan. Prom the time he assumed command and set out to reorganize and train his crew, plaintiff was congenial, jovial, obliging, and led his subordinates in the naval tradition by suggestion rather than by order.
Plaintiff’s mental deterioration was first observed after the landing on Tinian. One night, while off shore at Saipan, plaintiff ordered the ship to anchor more than a mile from the Saipan shore, in water far beyond the length of the anchor line in depth.
After Tinian the change in plaintiff’s condition was gradual, but continuous and became increasingly more pronounced. Disappointed at not being granted a rest, plaintiff returned to the combat area where he displayed nervous mannerisms which included: wringing of the hands; running his hands through his hair; washing his hands; dropping food off his eating implements; dropping a cup or glass when drinking coffee or water; staring into his cabin mirror. Eventually, these mannerisms were identified with the man, and eventually the condition culminated in a total breakdown. His previous attitude of friendliness was gone; he withdrew to his cabin. Orders which had been previously given in a conversational tone were rendered in a cracked and hysterical tone. Performance of his duties deteriorated. The former display of effective navigational ability, involving decisions of judgment, was gone. On one occasion, while engaged in unloading equipment at Leyte and during air attacks, he ordered the decks cleaned. On another occasion he ranted and raved at the officer-of-the-deck for allowing part of the crew to go ashore when others were working, a customary procedure. On still another occasion he appeared at 3:00 a.m. and ordered an adjustment to the mooring lines which was not required.
During an explosion of the ammunition dump at Leyte, plaintiff was in his cabin. After the din had passed, the executive officer went to the door and heard plaintiff cry, “My *1154 God, help me. I’m locked in. from the explosion!” The executive officer opened the door without difficulty, both from outside and inside, by simply turning the handle. Shortly thereafter the executive officer was summoned to the bridge where he found plaintiff sitting on a step, with his head in his hands, sobbing and crying like a child. He said, “I can’t take it any more,” and asked the executive officer to assume command. From this time on, with one exception,[4] plaintiff became disinterested, retired to his cabin, eating his meals there, seeing no one except the executive officer, and drinking intoxicating beverages to excess.[5] When the executive officer showed him the order to prepare to withstand Japanese naval bombardment at Leyte at the time the U.S. fleet retreated to the entrance of the gulf, he said, “It’s your ship, I can’t do anything.” In appearance his posture slumped, and when he spoke his voice was choked up. During the remainder of his command of LST 213, the crew endeavored to cover up for plaintiff and to prevent him from committing a serious error which would mar his Navy record, of which he was extremely proud.
On February 27, 1945, plaintiff left the LST 213 after a pathetic scene in which he was lowered down a 90-foot ladder, secured around the waist by a French bowline. He was 26 years old, but “he looked like a middle-aged man.” Plaintiff’s executive officer concluded his affidavit of August 23, 1961, presented to the Correction Board, as follows:
* * * the foregoing * * * [are] recollections concerning the man about whom I have spoken many many times over the intervening years, publicly and privately, as an example of what a horrible experience it was for me to observe over a long period of time the collapse of the entire personality of an able, capable, admirable officer who operated in the best traditions of the United States Navy to a broken man who appeared twice his age and incapable of handling things which had formerly been routine.
*1155 From the time of his detachment from LST 213 until May 5, 1945, plaintiff was in the care of Navy doctors. The conditions which resulted in plaintiff’s removal from the ship, as reflected in the medical report were: nervousness, apprehension, insomnia and anorexia (loss of appetite), loss of weight, impairment of memory and mental confusion. Physical examination also revealed increased psychomotor activity, trembling of the hands and three plus reflexes. On February 27, 1945, the day of plaintiff’s detachment from the ship, a notation was made on the records of U.S. Naval Hospital #7 that he was extremely tense, nervous, confused, depressed, irritable, looked older than his age of 26 years and had tremor of the hands. A diagnosis of “true Combat Fatigue” was entered in the record and sedation prescribed. On March 5, 1945, a Board of Medical Survey confirmed the diagnosis of true combat fatigue, recognized an existing neurosis, and recommended a transfer to a Naval Hospital in the continental United States for prolonged rest and rehabilitation. He was evacuated to U.S.N.H., Oakland, California, and later transferred, at his request, to a hospital at St. Albans, New York, near his home.
Plaintiff was admitted to St. Albans on March 30, 1945, where he was examined physically and had weekly interviews to and including April 20,1945, on which date a notation of “No complaints. Status quo. Bequests return to ‘full duty’.” was recorded. During this period plaintiff was in a “sick leave” status, living at home.
While plaintiff was on sick leave and officially stationed at St. Albans, members of his family observed that a great change had taken place in him. Prior to his entry on active duty and up until his departure from the United States on the YMS, he was a very quiet, mild-mannered, congenial, well-liked young man with many friends. He was jovial, happy, with no nervous characteristics. Mentally and physically he was well, having reached above average success in high school and at the Naval Academy. Upon his return from the Pacific, he was not well, and he did not look well; he was thin, had an odd expression about his eyes, and a worried look. He appeared under considerable strain, was nervous, on edge, unable to remain still; he paced the floor from room *1156 to room, turned his nights into days, and when asleep for short periods of time, he screamed violently. He was withdrawn, as if in another world, and did not seem to hear what was said to him. He had occasional lapses of memory. He was no longer the kind, loving, and considerate person he had been; he became brutal, had a quick temper, and was given to drinking.[6] Conscious of company or believing that others looked at him curiously, he repeatedly told his sister not to be concerned if she noticed something peculiar or odd in his appearance, especially his eyes, for he was all right.
Plaintiff was insistent that he be allowed to return to combat duty. His reason was that somehow he must erase the shame he felt at being accused of or blamed for the death of the U.S. Navy pilot whose plane was shot down by the LST 213.[7] Plaintiff’s wife and mother entreated him to stay in the States and sought the aid of a chaplain at St. Albans to prevent his return to the Pacific. Notwithstanding, he was discharged from St. Albans on May 5, 1945, to temporary duty,- and he was subsequently assigned to the U.S.S. Agenor, a repair ship operating in the Pacific. Prior to his transfer from St. Albans, plaintiff appeared before a Medical Survey Board on April 23,1945. The report of the Board, recommending a return to full duty, signals his emotional liability and retains the diagnosis of fatigue, combat.[8]
*1157 The exact date plaintiff assumed his duties on the U.S.S. Agenor is not disclosed by the record; and the nature of his duties is indicated only in his own testimony that he “was relieving the commanding officer.” No evidence appears relative to his behavior or naval capabilities during the period from his discharge from St. Albans through the remainder of his naval career in active service. From the juggling of dates found in the record, it can be surmised that plaintiff served on the Agenor about 3 months. His medical history reveals the following entry: “9A)-45 U.S.S. AGENOB Examined this date and found physically qualified for transfer.” The next entry concerns his separation from active service.
Plaintiff was given a terminal physical on September 25, 1945, and a physical for promotion on October 19, 1945; at the trial he remembered the terminal physical, which he testified was routine and perfunctory, but he had no recollection of the other. Both examination reports noted his history of combat fatigue, and both also recorded no other remarkable complaint or observation. There is no indication that a psychiatric or neurological examination was made. Both examinations found him physically qualified. He was ordered on terminal leave September 25, 1945, and released from active duty effective November 26, 1945.
Plaintiff’s wife testified that after his release from active duty, “the life of misery began.” His condition was worse than when he had come home on sick leave. His appearance and personality had changed; he was a different man; emotionally upset; prone to hysteria; very nervous and uneasy; he could not stay put; paced the floor; wrung his hands and put them to his head. He did not sleep well at night; had night terrors; cowered and screamed in his sleep; sudden noises upset him; could not concentrate; wandered in conversation ; and had lapses of memory. He was disinterested; he cried; he complained of headaches; and he drank intoxicating liquor. He had periods of marked anger towards his wife and 3-year-old daughter, became violent, smashed dishes, struck his wife and child, and later said he could not remember why he behaved in that manner.
*1158 Both plaintiff and Ms wife were confident that his condition would improve in time. Rather than becoming better his condition depreciated. Incidents of brutality with blows directed, upon different occasions, at his wife, daughter, or mother-in-law, and including the throwing of knives and the smashing and throwing of dishes, became more and more frequent. He drank excessively, and reoccurring spells of depression were exhibited once in an attempt at suicide, and on another occasion he gave his mother-in-law a knife and told her to open his venís. When he was in this condition his wife would summon a doctor, a friend, or the police. On one occasion he was committed to the Hudson River State Hospital at the request of his wife.
From 1946 through February 1952, plaintiff saw and was examined by a number of physicians. For the most part the visits were instigated by plaintiff’s wife, and the doctors strongly urged plaintiff to undertake psychiatric treatment. The recommendations were not followed because of an admitted inability to finance such care and an unavowed, shocked pride at the possible discovery that he might be suffering from a mental condition.
In June 1952, plaintiff requested admission to the North-port Long Island VA Hospital, but he was denied because of the lack of available beds. He turned to the Kings County Hospital where he was admitted on June 19, 1952, and discharged on June 23, 1952, with the diagnosis of phycho-neurosis, mixed. The diagnosis of anxiety reaction has consistently remained throughout the numerous examinations he has had since June 1952.
On October 16, 1957, while committed to the Hudson River State Hospital because of suicide threats, he filed a claim with the Veterans Administration by reason of a nervous condition which had existed “since 1944 to the present time,” stating that he had been totally disabled since August 1957. On February 8, 1958, he received his first thorough psychiatric and neurological examinations, wherein no organic basis for the diagnoses of psychoneurosis, anxiety reaction with depressive phenomena, moderate to severe, was indicated. After a thorough investigation to determine whether plaintiff’s affliction was service connected, the VA *1159 rated plaintiff as 50 percent disabled, and held that the disability was incurred in military service.
Since 1957, plaintiff has been in and out of many hospitals. He has received individual and group psychotherapy, corrective and occupational therapy and vocational counseling. The medication of sedation, first prescribed while plaintiff was on active duty, has been required throughout the years. The diagnoses of psychoneurosis or anxiety reaction have been confirmed periodically by the VA since 1957. Plaintiff was confined in a locked ward of the Franklin D. Roosevelt VA Hospital at Montrose, New York, when his testimony was taken at a session of the trial on May 20,1964.
On that occasion plaintiff was quiet and in answer to questions from counsel briefly reviewed (1) his educational background in engineering and advanced mathematics, (2) the types of work which he performed subsequent to his separation from active service and (3) his combat experience and the shooting down of an American pilot for which he was blamed. The incident, not verified by the executive officer, has preyed on plaintiff’s mind through the years.
Although of above average intelligence, as revealed in tests and the success he had in high school and at the Academy, plaintiff has continually failed in every civilian occupation he has undertaken since his release from active duty. During the period 1946-58, he held seven jobs, six of these for approximately 1 year and his highest annual earning was $7,200. He tried selling diesel engines (December 1, 1945 through April 30, 1947); inspecting safety devices on machinery for Liberty Mutual Insurance Company (1947-1948); taking single-trip employment on ships of the American President and American Hawaiian Lines (1949); working for Military Sea Transport Service (July 3, 1950, through February 29, 1956) ;[9] applying his technical skill at Fair- *1160 child Engineering- (August 27,1956 through August 9,1957) ; teaching in a junior high school (September 1958, through April 1959); working in a Rhinebeck factory putting wires together (8 days); and finally, oiling roads and doing office work as a timekeeper for the Dutchess County Highway Department (214 years).
Plaintiff’s inability to obtain and retain a position is explained in a psychiatric report prepared at the VA Hospital at Montrose, New York, in February 1960:
* $ * * *
* * * The strain of continued prolonged combat duty broke his defenses with the onset of overt psychoneu-rotic symptoms.
In the ensuing years he has revealed a progressive decline in his ability to meet even minimal stress * * *.
At the trial, plaintiff testified to the effect that he would take on a new job and for a while everything would go along fine. Then something would happen, and he would “blow up.” Whatever mechanism with which a human personality is endowed which permits him to live through the stresses and strains of everyday life, looking for a tomorrow to remedy the ills which afflict him today had, for plaintiff, completely broken down. His combat experience had worn thin the buffer to his normal emotions and characteristics and the attempted repair of such abnormal conditions has been unsuccessful. A part of the machine is no longer functioning in a normal manner.
On May 13, 1959, approximately 20 days after the loss of his teaching job, plaintiff applied to the Board for the Correction of Naval Records, requesting a change of his records to show that when he was released from active duty in 1945, he was permanently disabled and that his disability was incurred in military service. Plaintiff requested a hearing before the Correction Board, accompanied by counsel. The requested hearing was denied by the Correction Board on two separate occasions, April 5, 1961 and again on January 9,1962. A petition was filed in this court on February 1,1962, alleging that the Board was arbitrary and capricious in refusing to grant plaintiff a hearing and that its conclusion from ¡the evidence submitted to it was erroneous and not *1161 supported by substantial evidence and contrary to the evidence. Request was made that plaintiff be found permanently disabled for military service on November 26, 1945, and entitled to disability retirement pay from November 27, 1945, less compensation previously received from the Veterans Administration.
The case was tried before the commissioner on May 19-20, 1964, and November 24, 1964. The record before the Correction Board was received in evidence during the trial, in addition to certain Clinical Records which include examination reports made at VA hospitals since the date of the Board’s final denial of a hearing. The documentary record in the case is substantially what the Board had before it when making its determination, with the exception of testimony of several witnesses who were closely associated with plaintiff before, during and subsequent to his military service.
Prior to its final denial of a hearing, the Board had before it (1) plaintiff’s Naval record, including the record of his hospitalization in the service; (2) the Veterans Administration medical and rating records up to October 1961; (3) statements and affidavits of William J. Oliver, plaintiff’s executive officer aboard the LST 213; Jane Hoppock, plaintiff’s sister; Bernice Hoppock, plaintiff’s mother; Dorothy Hoppock, plaintiff’s wife; Mrs. Wright, plaintiff’s mother-in-law; Lyle B. Woodward, New York State Veteran Counselor ; and Dr. Petty, the LST Medical Officer during plaintiff’s command of LST 213; as well as quotations of plaintiff’s statements to his counsel. The Correction Board solicited and apparently relied exclusively upon two advisory opinions in the matter from (1) the Naval Physical Disability Review Board, and (2) the Bureau of Medicine and Surgery. Both opinions are in evidence. The Physical Disability Review Board found, from plaintiff’s medical history while in the service, that (1) he was physically and mentally fit at the time of his release from active service; (2) he had been gainfully employed from 1945 to 1955; and (3) the long delay before application was made to the VA for compensation seemed significant to the Board. The opinion of the Bureau of Medicine and Surgery, strongly based on plaintiff’s military medical history, concludes that plaintiff’s claim has no *1162 medical merit. The statement is made that no evidence was found that plaintiff’s condition prior to 1952 was anything short of being ñt for full military duty; the 7-year interim period after release from active duty indicated to BuMed a lack of causal relationship between his present condition and his prior military service.
Defendant’s only witness at the trial of this case was a doctor qualified in psychiatric medicine to render an expert opinion. He did so, stating that based on a study of the records in this case (he has never seen or examined plaintiff), it was his opinion that plaintiff was qualified physically and mentally for full military duty on November 26, 1945. He also testified that his opinion was based on well-recognized medical principles. Upon cross-examination, however, whatever value the doctor’s testimony may have had seems to have been utterly dispelled when he, in effect, agreed that plaintiff suffered from combat neurosis shortly before his release from active duty and that his return to duty, which was recommended by the Medical Survey Board at St. Albans, may well have been appropriate therapy for his illness; and that the use of such therapy is based on well-recognized medical principles.
The lack of expert medical testimony in plaintiff’s behalf at the trial should also be mentioned at this point. Contrary to the practice in cases such as this one, plaintiff chose not to have expert medical opinion evidence. Viewing this phenomenon most strongly against plaintiff’s case, it can reasonably be surmised that an opinion of an expert nearly 20 years after the crucial date would have added little to plaintiff’s case in view of the voluminous medical histories, examinations and reports which were already part of the record.
The Correction Board’s refusal to hear plaintiff’s case must, in view of the record before it, be based on the advisory opinions mentioned herein. In turn, these opinions appear founded on no other medical evidence than plaintiff’s military medical history. The emphasis in both opinions is on plaintiff’s physical fitness, when the substantial evidence before them points to a combat neurosis. It can only be surmised therefrom that the Physical Keview Board and the Bureau of Medicine and Surgery gave little or no weight to *1163 the diagnoses of psychoneurosis or anxiety reaction made again and again by private doctors and VA medical examiners after plaintiff’s release in 1945. The Supreme Court states in Robertson v. Chambers, 341 U.S. 37, 38-40 (1951) :
The principal question relates to the provision in § 302 (a) of the Servicemen’s Readjustment Act of 1944, 58 Stat. 287, 59 Stat. 623, 38 U. S. C. § 693i (a), which describes the scope of review by the Review Board as follows: “Such review shall be based upon all available service records relating to the officer requesting such review, and such other evidence as may be presented by such officer.” Respondent contends that the term “service records” means the record of the service which the military man has rendered from the time of his entry into the service until his discharge. That was the view of the Court of Appeals. We, however, think otherwise.

H* % % % Hi

The powers granted the Retiring Board have been construed by the regulations in a liberal fashion, not in a narrow; and stifling way. Thus the Adjutant General is required to furnish the board with the “originals or certified copies of the complete medical history, and of all other official records affecting the health and physical condition of the officer.”[1] The oral examination of the officer is granted for the purpose “of making full discovery of all facts as to his condition.”[2] These hearings are not contests; they are inquiries concerning disability. The purpose is to get at the truth of the matter.[3]
The medical history following the retirement will often be of great importance to the Review Board, since the statute of limitations which governs review is a long one. Requests for review may be made within 15 years after the retirement or after June 22,1944, whichever is the later. § 302 (b). Medical history may therefore be highly pertinent to the inquiry. Plainly the officer is granted authority under § 302 (a) to introduce such evidence; and it is certain he will do so if it is favorable. We hesitate at a construction of the statute which fore *1164 closes the Army from considering the evidence when it is unfavorable.[4] Yet that would be the result if we construed “service records” narrowly. We think it would be more in harmony with the nature of the procedure, the purpose of the inquiry, and the powers granted the Review Board to construe “service records” broadly enough to include these medical reports.
The reports in issue were official government reports transmitted to the Army and incorporated in that department’s files. They therefore became a part of the record of the officer pertaining to his service. We conclude that they are “service records” within the meaning of § 302 (a).
See Bevins v. United States, 166 Ct. Cl. 547 (1964) ; Smith v. United States 168 Ct. Cl. 545 (1964). Statements and affidavits which were before the Correction Board, and we can assume before the Bureau of Medicine and Surgery, uniformly contradict the finding of BuMed that no evidence could be found prior to 1952 that plaintiff was other than physically and mentally well. The symptoms of plaintiff’s illness, which were the same as those exhibited while he was commanding officer of the LST 213 and which persisted in increasing degree until his hospitalization in 1952, were consistently described in affidavits before the Board and reiterated as oral testimony at the trial.
Both opinions before the Correction Board refer to the lapse of time either before hospitalization (BuMed) or before application to the Veterans Administration (Physical Review Board). Both these allusions seem to refer to the service-connection for plaintiff’s condition. In addition to the compelling fact that the Veterans Administration found plaintiff’s affliction service connected, notwithstanding the passage of 12 years before application, and only after a thorough investigation, the short answer to the position of the Boards was given in the earlier decision of this court in this case on the question of the statute of limitations in ref *1165 erence to the delay of 12 years before application to the YA and 14 years before application to the Correction Board citing Friedman v. United States, 159 Ct. Cl. 1, 34, 310 F. 2d 381, 401 (1962), cert. denied, 373 U.S. 932 (1963) :
* * * Congress lias deliberately given servicemen this lengthy period in which to apply to the Correction Board although no Ketiring Board has been called or asked; in effect, Congress has allowed many servicemen a very long time in which to seek retirement pay and has not insisted that application be made at or upon release from service. * * *.
In the Smith case, supra, at 553, and with some pertinency here, is the following statement of the court:
* * * Where the medical issue is complex and in considerable dispute, and the Veterans Administration has previously found service-connection, a disposition of the claim for disability retirement by the Correction Board without a hearing and without an analysis of the evidence in writing is inadequate assurance that due weight was given to all of the evidence, both medical and non-medical, even though the opinion may formally recite that it was based upon all of the evidence. * * *.
Finally, plaintiff’s employment record was before the Board, is part of this case, and deserves mention, especially in view of the finding by BuMed that it was gainful employment in positions of responsibility. During the period 1946-58, plaintiff held seven jobs, six of these for approximately 1 year and his highest annual earning was $7,200. When viewed in the light of his intelligence and training, plaintiff’s employment record is far from probative proof of a satisfactory occupational adjustment to civilian life from military life, as the finding of BuMed seems to imply. Being gainfully employed for a period of years does not establish a normal adjustment if underlying the gainful employment there is a history of seven job changes, inability to meet the responsibilities which the employment involved, and failure to retain any of the seven positions for a considerable length of time. The employment record revealing a “socio-eco-nomic impairment, moderate to severe” (YA psychiatric examination of 10-16-63) tends to confirm rather than discount the other evidence of a neurosis or psychiatric condi *1166 tion contracted during plaintiff’s active service in combat, and medically confirmed as a “true combat fatigue.”
The terminal physical examination given plaintiff on September 25, 1945, and the promotional physical examination of October 19,1945, deserve comment because of the Board’s apparent reliance on the findings made therein with regard to plaintiff’s physical qualifications. It would seem sufficient to state that no psychiatric or neurological examinations were made when those examinations were accomplished, although plaintiff’s history of combat neurosis is noted in each examination report. Suffice it to say that during the mass demobilization of 600,000 officers and nearly 8,000,000 enlisted men from 1944 to 1946, “terminal physical examinations were not as thorough as they might have been in many cases and that a more intensive investigation * * * might have developed hidden clues of things to come.” Smith, supra, at 549. See also Woodard v. United States, 167 Ct. Cl. 306, 310-11 (1964).
Notwithstanding the lack of evidence of plaintiff’s physical and mental conditions, behavioristic pattern and professional capabilities during the short tour of duty on the U.S.S. Agenor following his discharge from St. Albans Hospital and prior to his release from active duty in 1945, and, although no expert medical testimony was adduced at the trial in his behalf, the record amply supports plaintiff’s claim that he was permanently incapacitated for active military duty at the time of his release on November 26,1945, and that the cause of his incapacity and the incapacity itself are incidents of the service.
In summary, the record, substantially as it was before the Board for the Correction of Naval Records shows that plaintiff’s “Combat Fatigue” was, in fact, a complete collapse; he had no psychiatric examination at St. Albans; no psychiatric or neurological examinations were made at the time of his release; he consulted doctors in 1945, and thereafter, who found that he was neurotic and advised him to seek psychiatric treatment; he applied for hospitalization to the Veterans Administration in 1952 and was informed there were no beds available; he sought treatment at the Kings County Hospital in that year, and was released with a diagnosis of *1167 psychoneurosis; his psychoneurotic condition prevented him from obtaining and retaining positions commensurate with his training and intelligence; from 1946 to 1957 he was unsuccessful at seven different jobs; beginning in 1957 he has been hospitalized most of the time; and at the time of his release from active duty, plaintiff was seriously disabled and has been since that date.
In view of the record and what is established thereby, the refusal of the Board for the Correction of Naval Records to accord plaintiff a hearing when it had before it evidence which indicated error or injustice, or correct plaintiff’s record on the basis of the evidence, was arbitrary, erroneous, not supported by substantial evidence, and contrary to the evidence.
The plaintiff is entitled to recover disability retirement pay from the day following the date of release from active duty, less amounts received as disability compensation from the Veterans Administration since his release from active military service.
FINDINGS oí? Fact
1. Plaintiff was born on May 12,1918, and at the age of 17 enlisted in the U.S. Naval Reserve on June 10,1935. Upon graduation from high school, plaintiff received a scholarship to City College of New York, but he attended that college only a short time, preferring to work and seek formal preparation for admission to the Naval Academy at a school established for that purpose. His enlisted status in the Naval Reserve was terminated when he entered the United States Naval Academy on July 8, 1938. In his first physical examination report at the Academy, dated July 8, 1938, a notation of “Faint tremor fingers” was indicated next to the caption “Nervous system.”
2. Plaintiff graduated from the Naval Academy in December 1941, in the upper third of his class. Although plaintiff had been found qualified medically by numerous physical examinations for full duty, including active duty at sea and in foreign service, a Board of Medical Survey recommended a discharge from the Naval Academy and the Naval Service on October 27,1941, in which it was noted that plaintiff had *1168 retinitis of the left eye and defective vision. The recommendation was approved by the Chief of the Bureau of Medicine and Surgery, and he was not commissioned in the Regular Navy. All examinations of plaintiff’s eyes prior to September 12,1941 showed vision of 20/20 in each eye. On September 12, 1941, a diagnosis was made of retinitis of the left eye and vision of 9/20, corrected to 20/20 by glasses. On December 19, 1941, plaintiff was qualified with a waiver for defective vision, corrected, and he was appointed an ensign in the United States Naval Reserve.[1]
3. Plaintiff entered upon active duty as an ensign, USNR, on January 5,1942, and served on active duty until November 26, 1945, when he was released from active duty in the rank of lieutenant commander, USNR. On October 1, 1942, he was examined and found physically qualified to perform active duty at sea and to be promoted to lieutenant, j.g., USNR. On October 10,1943, plaintiff was found physically qualified to perform all duties at sea and to be promoted to lieutenant, USNR. From a physical examination undergone on October 19, 1945, he was found physically qualified for a temporary promotion to lieutenant commander, and be was given that rank in the U.S. Naval Reserve effective October 3, 1945.
4. In addition to the naval training obtained at the Academy, plaintiff attended naval installations at Great Lakes, Illinois, Notre Dame University, Cornell University and Yorktown, Virginia, receiving courses directed primarily in the fields of Mine Warfare and Diesel Engineering.
From March 1943 to January 9,1944, he was in command of a mine sweeper, the U.S.S. YMS 287, which served in combat against the Japanese in the Pacific. Between January 9, 1944, and February 27, 1945, he was commanding officer of an amphibious landing ship, the U.S.S. LST 213, which vessel participated in the invasions of Tarawa, Saipan, Tinian, Leyte and Luzon. The combination of both military commands gave plaintiff approximately 2 years of combat sea duty.
*1169 Plaintiff was decorated as follows: Pre-Pearl Harbor Ribbon with one dtar; American Theater of Operations Ribbon; Asiatic-Pacific Theatre of Operations with six stars, each indicative of a combat campaign; Philippine Liberation Ribbon with two stars.
Plaintiff performed no military service subsequent to his release on November 26,1945. He was honorably discharged from his commission and from the Navy on September 1, 1955.
5. As commander of the mine sweeper YMS 287, plaintiff was engaged in combat duty in the Ellice, Gilbert and Marshall Islands, including the invasion of Tarawa. His ship was subject to air attacks, and he witnessed the landing at Tarawa, where, as a matter of historical fact, about 990 Marines were killed and 2,800 wounded in November 1943.[2] A duty assignment of the ship that plaintiff commanded consisted in locating mines set out by the enemy and disposing of them in the open sea, thereby protecting the American Task forces from this menace. Accompanied only by his steward, plaintiff personally went out in a small dinghy, sometimes at night, to locate the mines and tow them back to the minesweeper for further disposal.
6. On January 8, 1944, plaintiff was detached from the YMS 287, and on that day he took command of the LST 213 at Funafuti, Ellice Islands. At that time, the LST 213 was not efficiently operated, the morale of the crew was very low, and desertions from the ship were not unknown. At the age of 25, in the rank of lieutenant, plaintiff assumed command of a ship whose company was composed of 110 men and 8 officers, and whose landing force comprised approximately 400 Marines. As commanding officer, he reorganized the ship, and through intensive training of its crew, transformed it into one of high morale and efficiency, a credit to the fleet of which it was a part, and later selected for difficult and dangerous operations.
7. On December 17, 1943, II. M. Scull, Commander of Service Squadron Four, Pacific Fleet, recommended plaintiff’s change of status from the Naval Reserve to the Regular Navy. In this recommendation it was stated that plaintiff *1170 performed his duties as commanding officer of the U.S.S. YMS 287 in an outstanding manner; constantly displayed excellent judgment and initiatives; kept his ship in a constant state of preparedness; and had taken over the command of. the U.S.S. LST 213 in a most expeditious manner. The Commander Service Force, Pacific Fleet, approved the recommendation. It was received by the Bureau of Naval Personnel in Washington on February 3, 1944, but no satisfactory evidence appears determinative of the reason why the request was not granted.[3]
8. Plaintiff’s first combat operation after he assumed command of the LST 213 was during the invasion of the Gilbert and Marshall Islands. His ship carried supplies from Funafuti to the various air bases in the Gilbert and Marshall Islands, often without escort and subject to frequent air raids and attacks from submarines.
9. After the Gilbert and Marshall Islands operation, the LST 213 was prepared at Pearl Harbor for the invasion of Saipan. The ship was part of a nest of ships in the harbor, and it narrowly escaped an unexplained explosion and fire one night in which 7 or 8 neighboring ships were destroyed, and a number of men known by plaintiff were killed.
The LST 213 carried approximately 400 Marines, who were part of the first-wave assault on Saipan, and landed them in the dark before dawn under artillery barrage from offshore naval vessels. Personal friendships developed on the LST 213 between crew and passengers, which friendships ended with the death of a large number of men disembarked at Saipan.
Part of the freight of the LST 213 was high octane gasoline for the tanks and personnel carriers also carried aboard. Of course, ammunition was also part of the cargo; but the fuel and its terrific explosive potential was feared to a greater extent than the ammunition. At Saipan an explosion occurred, followed by flames which leaped 20 to 30 feet in the air, the moment the assault forces left for the beach. The *1171 impact which the realization of the perpetual hazard of high explosive made remained with the crew, including plaintiff, for a long time, although the fire had been promptly brought imder control.
During the 5 or 6 days after the initial assault on Saipan, the ship loaded cargo from vessels at sea, landed the cargo on the beach, patrolled the beaches at night to rescue men and salvage material, and was constantly subject to attack from the air and from shore batteries. Following this assignment, plaintiff’s ship was ordered to Kwajalein in the Marshall Islands to transport a load of ammunition to Sai-pan, unescorted during the entire voyage and in a condition of continual alertness because of possible air and submarine attacks.
10. After the Saipan operation, the LST 213 was ordered to carry first-wave Marines and their amphibious equipment for the assault landing on Tinian. Again, as at Saipan, the ship conducted its operation underneath a barrage, patrolled the beach at night and rescued and evacuated wounded men to other ships. During the 5 to 7 days of these operations, the ship was subject to small arms and mortar fire from shore. It had little protection from the American battleships which retired to sea 10 to 15 miles away. The operating fleet was thus scattered in order to avoid the danger of forming a concentrated target.
11. After operating at Tinian, plaintiff’s ship, often with little or no escort, was engaged in areas where it was almost continually subject to attack, usually by sporadic, single plane, harassing assaults.
The ship was ordered to participate in the invasion of Leyte, assigned to the left flank, at Dulog Beach. It landed first or second assault-wave personnel under barrage and transported supplies, including gasoline and ammunition, from supply ships to the beach.
Mr. Oliver, the Executive Officer of the ship during this operation, described the battle of Leyte in his affidavit presented to the Correction Board as follows:
I doubt if there is a single survivor of this ship who was on board during the battle of Leyte who does not look back on that period from D-Day —1 to D-Day +10 *1172 as the most harrowing, physically and emotionally, in their entire life. * * *
During the unloading of heavy cargo (including ammunition) at Leyte, the ship underwent so many air attacks that it was difficult to log them. There is testimony to the effect that as many as 26 raids occurred in 1 hour and that the ship’s defenses took a toll of five Zeros and one J apanese bomber, and, in error, shot down a U.S. Navy plane, killing the pilot.
In that battle the crew and officers of the LST 213 witnessed the death of men with whom acquaintance had been made and friendships developed. In one experience testified to by Mr. Oliver, a Marine sergeant “just plain disappeared” in front of his eyes when struck by a shell.
On another occasion, during the course of the battle, a huge ammunition dump on the shore within 400 or 500 yards from the ship was struck by a Japanese bomb and exploded. The tremendous concussion pushed the 5,000-ton ship sideways and knocked almost all men on board off their feet. The roar permanently deafened one man on the ship, who was later transferred because of deafness. Exploding ammunition passed directly over the ship for more than an hour and struck vessels beyond. The ship itself was reported missing at the time.
There was a period of days during the Leyte operation when the LST 213 had no naval protection. When the Japanese fleet entered the gulf most of the U.S. ships had withdrawn to the entrance of the enclosure. The LST 213 remained in the shore area and was directly ordered by Admiral Kincaid to “prepare to withstand enemy naval bombardment.” Practically defenseless in this position, the ship remained there with anchor down. The LST 213 was well within the range of the Japanese guns during the raging-battle 3 to 4 miles away. As each Japanese vessel turned into the Leyte Gulf it aimed at the American ships close to the shore, but in so doing placed itself within range of the fire power of the remaining U.S. fleet. The entire fire of the fleet was concentrated upon the J apanese vessels and one by one as they entered the gulf, they were destroyed. The LST 213 as situated during this period was in the midst of *1173 tbe noise of one of the greatest sea battles ever f ought, where the Japanese naval power was essentially destroyed.
While leaving the Gulf of Leyte, the LST 213 picked up 212 survivors of two sunken vessels, the Hoel and Casco Bay. While these men were aboard, the ship underwent a concentrated Japanese aerial attack, experiencing as many as 10 single plane raids in 1 hour.
12. In the wake of the harrowing experiences at Leyte, when the ship’s crew was tense and tired from lack of sleep and lengthy periods of exertion, the LST 213 encountered and rode out a gigantic typhoon with waves more than 70 feet high. During this raging storm the executive officer passed out and has no recollection of what transpired for 2 days.[4]
13. The last naval operation in which the LST 213 participated while plaintiff was its commanding officer took place at the battle of Luzon in the Lingayan Gulf. Although not in the first echelon of assaulting ships because of hull trouble, men and officers aboard LST 213 witnessed attacks on other vessels and was subject to attack by small Japanese boats carrying explosives on kamikaze missions. (An. American vessel 50 feet from the LST 213, was completely destroyed by a direct hit.) In addition, at the landing, the LST 213 collided with another ship, and a fire broke out.[5]
14. Plaintiff’s quick reorganization of the LST 213 and training of its crew in January 1944 reflect favorably on his ability as a qualified naval officer. Por a period thereafter he also continued to conduct himself as a man fully competent to command the ship to which he had been assigned. Through his efforts the ship attained a reputation for exceptional performance, and was used for combat training of naval officers. Plaintiff associated freely with the officers aboard, played bridge with them, engaged in light, jovial conversation in the wardroom, and commanded the ship with orders which *1174 were giren, in the Navy tradition, as suggestions, creating confidence and respect from tfie ship’s officers and crew.
During the ship’s operation off the island of Tinian, plaintiff was first observed to show signs of mental deterioration.[6] One night he persisted in attempting to anchor the ship in water far beyond the depth of the anchor line at more than a mile from the shore of Saipan where the ship had retreated for the night. Saipan, at the time, was occupied by American forces, and if plaintiff feared any danger in anchoring the ship closer to shore, the fear was ill-founded, as the Americans on the shore were sufficiently secure to be working under lights.
15. After almost continuous operations in forward areas, with combat experience and performance of hazardous duties from January 1944 when plaintiff took command of LST 213, a tense and strained crew returned to Pearl Harbor following the invasion of Tinian. By this time plaintiff had participated in the assault on Tarawa, in the Gilbert Islands and Marshall Islands (during his command on the YMS 287) in 1943; also in Saipan where approximately 50 percent of the officers aboard the LST 213 were killed. Plaintiff looked forward to a rest or rotation to the States; however, as three of his officers were transferred from the ship, two because medical examinations showed them emotionally unfit for sea duty, plaintiff, of necessity, had to remain aboard. From Pearl Plarbor the LST 213 with plaintiff as its commanding officer returned to the combat area and the battle of Leyte Gulf.
16. After the return of the ship to the combat area, plaintiff began to display nervous mannerisms, which became more severely pronounced and culminated in a total emotional breakdown. Mamierisms which were, after a period of time, identified with the plaintiff include the following: wringing *1175 his hands; running his hands through his hair; washing his hands; dropping food off his eating implements; dropping coffee cups or glasses when drinking coffee or water; staring into his cabin mirror.
17. Contrary to his previous friendly attitude and association with the officers in the wardroom, he withdrew to his cabin. Although previously his orders were given in a calm, conversational tone of voice, his tone gradually became cracked and hysterical.
With the “collapse” of his personality came a deterioration in the performance of his duties. His navigational abilities, involving decisions of judgment, failed him and he “recognized that he had lost this knack.” He began to issue irrational, aggravating orders, such as requiring that the decks be cleaned during the unloading of equipment at Leyte, in the midst of continuous air raids and the confusion of battle, with part of the crew manning the guns and the other part moving cargo. On a prior occasion he flew into a rage all of a sudden, entirely inconsistent with his previous personality. He ranted and raved, almost hysterically, at an officer-of-the-deck for permitting part of the crew to leave the ship on liberty while other men worked, which was perfectly normal procedure. On another occasion he appeared on the deck at 3:00 a.m. and ordered an adjustment to the mooring lines which was not required.
18. After the terrifying explosion of the ammunition dump at Leyte, plaintiff was discovered in his cabin by the executive officer. When Mr. Oliver knocked at the cabin door plaintiff cried from within, “My God, help me. I’m locked in from the explosion!” The executive officer opened the door without difficulty both from outside and inside by simply turning the door handle.
Shortly after the explosion of the ammunition dump, when the crew was hastily unloading gasoline on the beach, the executive officer was summoned to the bridge by an enlisted man who virtually ordered him to report there at once. When Mr. Oliver reached the bridge he found plaintiff sitting on a step with his head in his hands, sobbing and crying like a child. He said, “I can’t take it any more,” and asked *1176 the executive officer to assume command. For some time prior to this incident, plaintiff had annoyed the executive officer by asking, every 2 or 3 minutes, how things were going. Thereafter, with one exception, plaintiff became disinterested, incapable of handling the ship. When the executive officer showed him the order to prepare to withstand Japanese naval bombardment, plaintiff said, “It’s your ship, I cannot do anything.” Throughout the great sea battle of Leyte Gulf and while survivors of the sunken American ships were being picked up 'he remained in his cabin. His physical posture slumped, and when he spoke his voice “choked up.”
19. The one exception to plaintiff’s inability to handle the ship occurred during the typhoon. The ship’s boat, weighing several tons, broke loose from its lashings and pounded the side of the ship. The plaintiff took the conn (the station from which a vessel is steered or directed) and acted with his former ability so that the officers later commented he was his old happy self. This was plaintiff’s last normal military function aboard ship. Thereafter, he seldom came out of his cabin, and contrary to his former prohibition against liquor aboard ship, he began to drink to excess.[7] He would stand in front of his cabin mirror, staring, holding a drink in one hand and running his other hand through his hair.
20. Plaintiff’s last attempt to handle the ship resulted in a collision. He took over the conn, suddenly, while the vessel was on the beach at Lingayen Gulf. The tide had been coming in and had caused the ship to pound on the beach. Because of plaintiff’s disconnected orders and directions, the ship collided with another; its anchor became fouled up when the anchor line crossed the anchor cables of two other ships; the wild swaying of plaintiff’s ship from side to side caused the other ships in the area to seek collision quarters. In *1177 despair, plaintiff turned to the executive officer and said, “My God, help me out of this.”
Thereafter, plaintiff remained in his cabin, eating his meals there. He saw no one but the executive officer, was intoxicated most of the time, continued to wring his hands and to stare into the mirror with a drink in his hand as if trying to decide whether to drink it or not. He exclaimed on occasion, “I’m done. I’m washed up.” For the remainder of the plaintiff’s command of the LST 213 the crew did their best to cover up for him and to prevent him from committing a serious error which would mar his Navy record, of which he was extremely proud. He always had an exceptionally high regard for the Navy and loved the sea. Fie was grateful that he was a graduate of the Naval Academy and was apparently the only man aboard ship who spoke of making the Navy his career.
21. On February 27,1945, the ship arrived at Tulagi where medical facilities were available; and arrangements were made to have plaintiff taken off the ship. He said goodbye to the officers on the ship with shaken emotion and emphasized how much he loved the ship. He became very upset when the executive officer ordered that a French bowline be secured around his waist for the descent into the small boat down a 90-foot ladder. As the small boat carried plaintiff to shore, the crew broke out a flag hoist which said “Good Luck.” He lowered his heads into his hands, and he looked like a middle-aged man although he was only 26 years old.
22. Plaintiff’s executive officer, William J. Oliver, an attorney before his entry on active duty during World War II, and who presently practices in Scranton, Pennsylvania, concluded his affidavit of August 23,1961, presented to the Correction Board, as follows:
All of the foregoing is a short scattered resume of isolated recollections concerning the man about whom I have spoken many many times over the intervening years, publicly and privately, as an example of what a horrible experience it was for me to observe over a long period of time the collapse of the entire personality of an able, capable, admirable officer who operated in the best traditions of the United States Navy to a broken man who appeared twice his age and incapable of handling things which had formerly been routine.
*1178 I have tried to summarize fairly in this statement this emotional breakdown as I observed it. Almost any phase or portion of the foregoing could be amplified with further observation and narration of specific incidents.
Upon reading and review of the foregoing my comment would be that the occurrence was even more drastic, more clear-cut and more depressing in its actual occurrence than anything that this statement contains, expressly or by implication. [Emphasis added.]
23. On February 27,1945, a naval doctor came aboard ship and removed plaintiff to a medical facility at Tulagi because of nervousness, apprehension, insomnia and anorexia (loss of appetite), loss of weight, impairment of memory, and mental confusion.
A physical examination revealed increased psychomotor activity, trembling of the hands and three plus reflexes. Plaintiff was transferred to the U.S. Navy Base Hospital #7 on the same day, February 27, 1945, where it was noted he was extremely tense, nervous, confused, depressed, irritable, and looked older than his age of 26 years, although no physical findings were made other than the tremor of the hands. A diagnosis of “true Combat Fatigue” was entered and sedation was prescribed.
On March 5, 1945, a Board of Medical Survey reported:
This officer was admitted to this hospital 28 Feb. 1945. On admission he showed marked symptoms of Combat Fatigue. He is extremely tense, nervous and irritable. He shows personality changes of confusion and anxiety and is fatigued to the point that he cannot carry out his assigned duties. His pre-service record shows no evidence of instability, maladjustment or neuropsychiatric disease. He has had over two years of continuous sea duty, a considerable amount of which has been under combat. His physical findings are negative except for extreme nervousness, tremor of hands and hyper-active reflexes.
It is the opinion of this board that this officer has a true combat fatigue and as such should be transferred to the nearest U.S. Naval Hospital within the continental limits of the United States for prolonged rest and rehabilitation.
The Medical Survey Board found plaintiff unfit for an indefinite period, and in accordance with its recommenda *1179 tion, be was evacuated and transferred to the U.S.N.H. at Oakland, California, on March 12, 1945. He was further transferred on March 22, 1945, to the U.S. Naval Hospital, St. Albans, New York, near his home, at his request. The prescription of sedation continued during this time.
Plaintiff was admitted to the Naval Hospital at St. Albans on March 30, 1945, where no treatment is indicated by the evidence. However, there is evidence that he was examined physically (there is no record of a psychiatric examination) upon admission, and had weekly interviews to and including April 20,1945, on which date the following notation was recorded: “No complaints. Status quo. Requests return to full duty.” During this time plaintiff was in a “sick leave” status, living at home. He was discharged from the hospital on May 5, 1945.
24. When plaintiff returned to New York City to report to the U.S. Naval Hospital, St. Albans, and during the period he was home on sick leave, his family observed a great change in him.[8] Prior to his entry into the naval service he was a very quiet, mild-mannered, congenial, well-liked young man with many friends. He was mild-tempered, jovial, happy, with no nervous characteristics. Mentally and physically he was normal, with a record above average in both high school and college, especially in mathematics. His condition was just that when he had left the States on the YMS 287.
Upon arrival at the Naval Hospital in St. Albans, plaintiff was not well; did not look well; was very thin;[9] had an odd expression about his eyes and a worried look. He ap *1180 peared as if lie had been under considerable strain. He was very nervous, on edge, could not remain still, and paced the floor from one room to another. He was very tense and turned his nights into days. When he slept for short periods of time, he screamed violently. He was withdrawn, as if living in another world, did not appear to hear a word said to him, and had occasional lapses of memory. No longer the kind, loving and considerate person he had been, he became brutal; had a very quick temper and was given to drinking. Apparently because of plaintiff’s belief about what others thought of his demeanor, he repeatedly told his sister that he was all right and if she noticed his odd and peculiar appearance, especially his eyes, she should not worry.
25. As indicated by the records of the Naval hospital at St. Albans and as testified at the trial, plaintiff repeatedly expressed an intense desire to go back to combat duty in the Pacific. His reason given at that time and repeated in his testimony during the trial was that he was blamed and held responsible for the killing by mistake of an American pilot. By going back, he thought, “everything would stop.”
Plaintiff’s wife and mother felt that he was too ill to return to the Pacific and solicited the aid of a chaplain at St. Albans to keep him in the States. Their entreaties were unavailing and when his wife sought to dissuade him, he insisted on returning to the Pacific.
26. The records of the Naval hospital at St. Albans indicate that plaintiff appeared before a Medical Survey Board on April 23,1945. The report of that Board, dated April 26, 1945, reads in pertinent part as follows:
Summary of case history: Patient was admitted to the sick list on 27 February 1945 aboard ship with Diagnosis Undetermined (Medical Observation) because of progressive nervousness, apprehension, insomnia, anorexia, loss of weight, impairment of memory and mental confusion, and fear of his ability to continue command of 4 months duration. He was transferred the following day to USNBH #7, Navy 152. There he was tense, nervous, irritable. Plis pre-service history showed no evidence of instability or maladjustment. Except for tremor of the hands, physical findings were negative. On 1 March 1945 diagnosis changed to Fatigue, Combat by reason of *1181 established, 6 days later he was transferred to USNFH #108. On 12 March 1945 he was transferred via air to USNH, Oakland, California. At his own request he was transferred to this hospital.
On admission he had no subjective complaints. History further revealed that he sustained a concussion of the brain associated with unconsciousness in June 1940. He graduated USN Academy in class of 1942 but because of a visual defect, he was transferred to USNE. He married in December 1941 and has a child of 2y2 years. He enlisted as A/S FNR in May 1935 and entered USNA, July 1938. He left U.S. in March 1943 and was C.O. of a YMS and an LST in the Central Pacific Area. He participated in invasions of Tarawa, Saipan, Tunisan, Leyte, and Luzon.
General physical, neurological and indicated laboratory examinations were essentially negative. Mental status: Aside from emotional lability was not remarkable. The diagnosis of Fatigue, Combat is retained. Under observation he had no psychic or somatic complaints and at this time neither desires nor requires further hospitalization, and requests return to full duty.
It is the opinion of the Board that this patient has recovered from his illness and is physically and mentally fit for full duty. It is recommended that that he be assigned to full duty.
Accordingly, plaintiff was ordered to temporary duty on May 5,1945.[10]
27. On May 14, 1945, plaintiff was examined at the New York Naval Dispensary, and he was found physically qualified for duty outside the continental limits of the United States. He was assigned to the U.S.S. Agenor, a repair ship operating in the Pacific, where, it was testified, he served *1182 as prospective commanding officer. The record does not indicate his reporting date, his physical or mental condition upon reporting or during his period of duty aboard this ship, or any relevant evidence of his competence or capability to perform his duties. His medical history has the entry: “TJ.S.S. AGENOR 9-9-45: Examined this date and found physically qualified for transfer.”
The petition in this case states that plaintiff served on the TJ.S.S. Agenor for approximately 6 months. The evidence adduced during the trial does not support this statement. From an “Abstract of Service” it is indicated that plaintiff was on the ship on August 7,1945, and that he was released from active duty on September 25, 1945. The facts also indicate that he (1) was discharged from the Naval hospital at St. Albans to temporary duty on May 5,1945; (2) took a month of rehabilitation leave; and (3) was released from active duty on September 25,1945. It can, therefore, be assumed that plaintiff served on that ship approximately 3 months.
28. After the war ended[11] plaintiff requested his release from active duty and it was granted. He was given a terminal physical examination on September 25,1945. The Report of Physical Examination reported that plaintiff’s weight was then 177 pounds, having an added notation next to “Recent gain or loss, amount and cause,” of “25 reco-operated [sic].” At the time of his appointment as a Reserve Officer in 1941, plaintiff’s weight was recorded as 163 pounds. Although plaintiff’s history of combat fatigue was noted on the Report of Physical Examination, his nervous system was reported as “normal.” The Summary of Defects noted “None,” and plaintiff was found “physically qualified for release from Active Duty in the U.S. Naval Reserve.”
Plaintiff was physically examined on October 19,1945, and found physically qualified for a temporary promotion to lieutenant commander. The earlier history of combat fatigue was noted thereon, but plaintiff’s nervous system was recorded as “Normal.” Plaintiff was promoted to lieutenant *1183 commander, U.S. Naval Reserve, (Temporary), effective October 3,1945.
Hiere is no indication that plaintiff was given a psychiatric or neurological examination as part of either his terminal physical examination or his examination for promotion. Plaintiff testified that he remembered the terminal physical was routine and perfunctory, but he had no recollection of the physical for promotion to lieutenant commander.
Plaintiff was placed on terminal leave September 25,1945, with his release from active service to be effective November 26,1945.
29. According to the testimony of plaintiff’s family, including his mother-in-law, and on the basis of an examination by a neurologist, Dr. Masselink, on February 28, 1946, plaintiff’s condition when he returned home on terminal leave was worse than it had been during sick leave. His condition was described as marked by a change in appearance and personality; he was a different man; emotionally upset; prone to hysterics, very nervous; uneasy; could not stay put; paced the floor; wrung his hands and put them up to his head. Plaintiff could not sleep at night; had night terrors; cowered and screamed in his sleep; sudden noises upset him; he could not concentrate; wandered in conversation; and his thoughts appeared to be elsewhere. His concentration was poor and he had lapses of memory. He had no interest in anything; he cried; he complained of headaches; and he drank intoxicating liquor to excess.
Plaintiff’s wife testified that after his release from active duty, “the life of misery began.” He was short-tempered, very irritable and nasty; he raved and ranted. He had periods of marked anger towards his wife and 3-year-old daughter, became violent, smashed dishes, struck his wife and/or child, and later said he could not remember why he behaved in that maimer. The spells of anger came on suddenly and apparently with little or no provocation.
30. Both plaintiff and his wife believed that his condition would improve after his return to civilian life. This hope was bolstered by pride on the part of both of them, notwithstanding the fact that family life was anything but a happy *1184 one. There were incidents of utter brutality, with blows by the plaintiff directed, upon different occasions, at his wife, daughter and mother-in-law. Each of these women have borne bruises inflicted upon them by plaintiff. The throwing of things (including a knife on two separate occasions) and the smashing of other things were a common occurrence. Profane language and threats were abusively bestowed on the members of his household.[12] He drank excessively, and had recurring fits of depression which were exhibited on one occasion by a suicidal note and on another by an offer of a knife to his mother-in-law requesting that she open his veins. Sometimes a doctor or a friend was called for help, at other times the police were called. Once he was committed to the Hudson River State Hospital at the request of his wife.
Between 1946 and 1952 plaintiff saw and was examined by a number of physicians, usually at the urging of his wife. Except for Dr. Masselink, who saw plaintiff on February 28, 1946, and prescribed a mild sedative, the testimony and record indicate that other doctors recognized plaintiff’s symptoms as being related to a mental state, strongly recommending psychiatric advice and help, which plaintiff refused to undertake because of financial difficulty.
31. In June 1952 plaintiff requested admission to the Northport Long Island VA Hospital, but he was told that there were no beds available. He then applied for and was admitted to Kings County Hospital, where he remained from June 19 to June 23, 1952. His diagnosis was recorded as psychoneurosis mixed, and he was released in the custody of his wife. The hospital doctor recommended continued treatment, however, as plaintiff’s wife testified, it was difficult to get him to see a doctor or to go to a hospital mainly because of pride and the shame of acknowledging that he suffered from a psychiatric condition.
32. On October 16, 1957, while committed to the Hudson River State Hospital after suicide threats, plaintiff applied for assistance from the VA, basing his application upon “nervous condition from 1944 to present” and stating that he had been totally disabled since August 1957. He was re *1185 leased from the Hudson Eiver State Hospital on November 20,1957, with a diagnosis of psychoneurosis, mixed, of which the YA was notified.
On February 4,1958, he received his first thorough psychiatric and neurological examination. No evidence of organic disease was found. His mild tremors of the head and coarse tremor of the hands, telangiectasia (dilation of capillary vessels and minute arteries) of the face, 3-plus deep tendon reflexes, cerebellar signs and spider angioma of the shoulders pointed to a psychiatric condition, diagnosed as psychoneurosis, anxiety reaction with depressive phenomena, moderate to severe.
33. The initial YA decision allowed service connection with a disability rating of 50 percent made effective October 16, 1957, the date a claim was filed with YA by plaintiff. The disability rating was subsequently reduced to 30 percent effective April 8, 1959, but was later increased to 50 percent effective April 8, 1959, by rating decision of December 18, 1959. By decision of August 23,1960, the rating of plaintiff’s service connected condition was increased to 80 percent retroactively effective from November 4, 1959. It thus appears that plaintiff has had a rating of 50 percent from October 16, 1957, through November 3,1959; and a rating of 80 percent from November 4,1959.
34. Plaintiff’s disability while in the military service was described as “Combat Fatigue,” a term which was used by the Armed Forces to include combat neuroses. During the period from 1946 to plaintiff’s first hospitalization after military service in 1952, private physicians who were consulted by plaintiff considered his condition to be a neurosis.
In June 1952, the Kings County Hospital diagnosis was psychoneurosis.[13] The diagnosis assigned by the Hudson Eiver State Hospital in 1957 was psychoneurosis, mixed. *1186 Diagnoses of private doctors during this later period were of similar nature. All subsequent diagnoses of the Veterans Administration were either psychoneurosis or anxiety reaction.
Tranquilizers were prescribed for plaintiff while he was in the military service, and he has taken them since that time. There has been continuous use of such medication, but his condition has remained poor.
Plaintiff refused to undergo psychiatric treatment from 1946 to 1952, however, once he subjected himself to such treatment, it was apparently indispensable.
35. At the U.S. Naval Academy plaintiff received a B.S. degree in Engineering, having studied mathematics to a stage which included integral and differential calculus. Subsequently, he studied Diesel electric engineering at Cornell. He was given government ratings for general, machine and safety engineering. His I.Q. is above average, and in psychiatric examination reports he is described as “a very bright individual almost devoid of emotional inner resources,” and of “above average intelligence.”
After his release from the service plaintiff could not obtain and retain a position commensurate with his educational training and general intelligence. During the period 1946-58, he held seven jobs, six of these for approximately 1 year and his highest annual earning was $7,200. In commenting on the several jobs he had held since his separation from Naval service, plaintiff indicated at the trial that throughout his employment after the war many people told him he was not a normal person. He further explained that for a while on a new job things would go well; and then circumstances, such as interpersonal difficulties; lack of interest in the job, etc. (or the thought that some circumstance or incident was imminent) tended to cause him to be “fed up” with what he was doing. Because of this feeling of discontent and dissatisfaction, he would “blow up.”
The report of a psychiatric examination of plaintiff prepared in February 1960, states, in part:
* * * The strain of continued prolonged combat duty broke his defenses with the onset of overt psychoneurotic symptoms.
*1187 In the ensuing years lie lias revealed a progressive decline in his ability to meet even minimal stress * * *.
DIAGNOSIS: Anxiety reaction, chronic, severe, manifested by irritability, poor occupational adjustment, dependency, alcoholism, tension, depression.
Ex Prec Stress: Combat.
Predisposition: Passive-aggressive personality.
Impairment: Marked.
PROGNOSIS: Guarded.
Other psychiatric reports conclude that plaintiff could not maintain a position because of his inability to cope with any stress. His adjustment was “marginal” ever since his discharge from military service.
36. Plaintiff’s first position after his release from military service was with American Locomotive Company, where he was employed prior to his entry into the service. Pie stayed on this job, selling diesel engines, from December 1,1945, to April 30,1947. After 4 months at Schenectady the company transferred him to Chicago where he felt like a “messenger boy”, drank heavily, developed an ulcer with vomiting of blood. He “blew up” and abruptly quit that job.
In 1947-48, plaintiff worked about a year for the Liberty Mutual Insurance Company in New York, inspecting safety devices on machinery and, again abruptly left that position.
During the ensuing year, plaintiff signed up for single voyages on ships of the American President and American Hawaiian Lines, for a total of four voyages. He testified he was “laid up” after some of these trips.
From July 3, 1950, to February 29, 1956, he worked, for Military Sea Transport Service. He was usually on the job for approximately 3 weeks out of 4, with 1 week at home. Because of his love for the sea, this was the period during which plaintiff made the most satisfactory adjustment. Nevertheless, at the end of 2 years in that job, he began to break down, was treated by a private physician, was admitted to the Kings County Hospital, and discharged as a psychoneurotic. During this period there were many spells of violence. He occasionally vomited blood, and in 1956, rather than to take a demotion, he resigned.
After resigning from the job with MSTS he was idle for 6 months. On August 27, 1956, he was employed by Fair- *1188 child Engineering. He resigned about a year later on August 9, 1957, because of “too much work” and difficulty with his immediate superior, a justification used by plaintiff in other resignations.
The Fairchild job was the last associated with the field of engineering. At this time the mortgage on his house was foreclosed, he wrote checks without funds in the bank, suffered from an ulcer condition with bleeding, and attempted to commit suicide with carbon monoxide.
Unemployment continued until September 1958 when, after occupational therapy, vocational guidance and psychiatric treatment, he obtained a job as a teacher in a junior high school at Poughkeepsie, New York. During this employment he received weekly therapy and medication, but after 3 months of teaching he was described as about to “blow up.” In January 1959 he was informed that his contract would not be renewed for another year, and in April 1959 he resigned without completing the school year.
He subsequently obtained work in a Rhinebeck factory, putting wires together. He quit that job after 8 days. His last employment was with the Dutchess County Highway Department at $380 per month, oiling roads and doing office work as a timekeeper. After 2% years he lost this job. At the time of the trial in May 1964 he was unemployed and confined to the Franklin Roosevelt VA Hospital in Montrose, New York.
37. An application filed by plaintiff in 1958 with the VA for an engineering position in Washington was denied because of his psychoneurotic condition, the record of which has prevented him from obtaining any civil service employment.[14]
*1189 38. Plaintiff filed bis application with the Board for the Correction of Naval Records on May 13,1959, after the loss of his teaching job on April 23,1959. In his application he requested a hearing and expressed a desire to appear with counsel before the Board.
The Board denied plaintiff a hearing on two separate occasions, first on April 5,1961, and again on January 9,1962. Prior to the final denial of a hearing, the Board had before it the following evidence:
1. Plaintiff’s Naval record, including his hospitalization in the service.
2. The Veterans Administration medical and rating records up to October 1961.
3. The statements and affidavits of William J. Oliver, an attorney who served as plaintiff’s executive officer aboard the LST 213; Jane Hoppock, plaintiff’s sister; Bernice Hoppock, plaintiff’s mother; Dorothy Hoppock, plaintiff’s wife; Mrs. Wright, plaintiff’s mother-in-law; Lyle B. Woodward, New York State Veteran Counselor; and Dr. Petty, the Medical Officer on the LST 213 during a portion of plaintiff’s command; and quotations of plaintiff’s statements to his counsel.
39. The documentary evidence before the Board for the Correction of Naval Records was substantially the same as that supporting the findings hereinabove set forth. In summary, it showed that plaintiff’s “Combat Fatigue” was, in fact, a complete collapse; he had no psychiatric examination either at St. Albans or at the time of his release from active service; consulted doctors in 1946 and thereafter who found that he was neurotic and advised him to seek psychiatric treatment; applied to the Veterans Administration for hospitalization in 1952 and was informed tfiere were no beds *1190 available; sought treatment at Kings County Hospital in that year, and was released with a diagnosis of psychoneurosis ; his psychoneurotic condition prevented him from obtaining and retaining positions commensurate with his training and intelligence; from 1946 to 1957 he was unsuccessful in retaining seven different jobs, regardless of whether the work was coupled with responsibility or simply menial tasks; from 1957 he has been hospitalized most of the time; and at the time of his release from active duty, he was seriously disabled and has been since that date.
40. The Correction Board had before it two advisory opinions solicited by it from (1) the Naval Physical Disability Review Board (hereinafter called the Review Board) and (2) the Bureau of Medicine and Surgery (hereinafter called BuMed).
The Review Board letter to the Board for Correction of Naval Records, dated February 27, 1961, which is part of the record in the case, indicates that in its opinion “the interests of the party and of the government in this matter are so well protected that a formal hearing with personal appearance will not be necessary.” The opinion of the Review Board contains the following findings:
1. From plaintiff’s military medical history, it was found that he was physically and mentally fit for full duty at the time of his release from active duty on November 26, 1945.
2. From records available to it, the Review Board concluded that plaintiff “was gainfully employed in what is best described as positions of responsibility” from 1945 to 1955.
3. The delay of 12 years from date of separation before plaintiff applied to the VA for aid was found to have for the Review Board “more than passing interest.”[15]
41. The Review Board opinion fails to comment on the voluminous VA examinations, reports and findings, the historical data contained in them, or the vital determination *1191 made by tbe VA that plaintiff’s disability was service connected. From mention by tbe Eeview Board that plaintiff was gainfully employed from 1945 to 1955, it can be inferred that statements, affidavits and VA records filed with plaintiff’s application for correction of bis military records were either totally disregarded or accorded little credibility. No mention is made of the fact that plaintiff was never given a psychiatric examination while in the service. No importance is accorded the material fact that the first psychiatric examination of plaintiff after release from active duty, resulted in a diagnosis of psychoneurosis, mixed. The Eeview Board emphasizes the various physical examinations plaintiff had prior to and at separation from active duty. Although all post-separation examinations reveal a psychoneurotic condition, emphasis is especially laid on physical fitness. Plaintiff’s failure to apply to the VA is stressed, although there seems to be no valid reason to emphasize the delay after the VA found that plaintiff’s afflictions were incurred in the service.
BuMed rendered its opinion in four paragraphs, the first containing references, the second plaintiff’s military medical history, the third a cursory comment on affidavits submitted by plaintiff’s counsel, and the fourth its ultimate conclusion that plaintiff’s claim had no medical merit. The most pertinent material statement in the opinion, in view of the ultimate conclusion recommended to the Correction Board, is the following:
In evaluating the numerous and lengthy affidavits submitted by the petitioner’s counsel, in conjunction with the remainder of records available, there is no evidence prior to 1952 that Mr. Hoppock’s mental condition was anything short of being fit for full duty as stated upon his separation physical examination findings. The interim period of seven years contraindicates any causative relationship of his present condition with his prior military service.
The conclusion reached in that statement is not supported by the affidavits and VA records upon which it purports to be founded.
In view of the available record which was obviously given scant attention by the Correction Board, the action taken in *1192 refusing to grant plaintiff a hearing was arbitrary, erroneous, not supported by substantial evidence and contrary to the evidence.
42. The plaintiff reiterated his request for an oral hearing twice after his application was filed: on October 12, 1961, and on December 4,1961. In these letters plaintiff’s attorney stressed the facts that, contrary to the opinions of the Keview Board and BuMed, the statements and affidavits showed clearly that plaintiff was incapacitated at the time of his release; the determination that there was not enough evidence to warrant a hearing, indicates that no credibility was given to the statements and affidavits; and that the Correction Board should have heard the case and permitted witnesses to testify.
On January 9, 1962, the Correction Board again refused to grant plaintiff a hearing. The Board especially noted that on July 19, 1950 (during the Korean crisis), plaintiff requested active duty; that his request was disapproved on November 10, 1950, for the stated reason that officers of his qualifications were not required at the time; and that BuMed “determined” that he was physically qualified with waiver of four defects. This “determination” was made without physical examination, merely from a review of the medical record on file and with BuMed’s seemingly meaningful explanation that the plaintiff was physically able to perform duty “insofar as can be determined” and that “in the event his services are essential this Bureau will interpose no objection to waiver of the noted defect (s) * * *.”
43. Although plaintiff was a Naval Academy graduate; had planned to make the naval service his career; served honorably and well from 1938 to 1945; earned seven battle stars in bitter fighting during World War II; volunteered for service during the Korean War; and requested to be retained in the Standby Reserves, he was discharged from his commission on September 1, 1955, with the brief notation “SECNAV Ltr dtd 5-27-55 Not Present for Physical Examination.”
,44. The record as a whole is found adequate to support a finding that plaintiff was permanently incapacitated for active military service at the time of his release from active *1193 duty in November 1945. His incapacity and the cause of his incapacity are incidents of military service. He is entitled to disability retirement pay from November 27, 1945, the day following the date of his release from World War II service.
The refusal of the Board for the Correction of Naval Records to (1) accord plaintiff a hearing when it had before it ample evidence of error and injustice; (2) its reliance upon incorrect advice from the Naval Physical Disability Review Board and the Bureau of Medicine and Surgery; and (3) its refusal to correct plaintiff’s naval record were arbitrary and capricious, clearly erroneous, not supported by substantial evidence and contrary to the evidence.
CONCLUSION OE LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover disability retirement pay from the day following the date of his release from active duty, less amounts received from the Veterans Administration, and judgment is entered to that effect.
The amount of recovery will be determined pursuant to Rule 47(c)(2).
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on November 23,1966, that judgment for the plaintiff be entered for $36,879.39.

The opinion, findings of fact and recommendation for conclusion of law are submitted under tiie order of reference and Rule 57(a).

 This case vividly depicts tie ravages and tragedy of war. In early life plaintiff was a normal individual, fired with an ambition to get an education. He made a fine record in high school, won a college scholarship, and ultimately graduated from the U.S. Naval Academy. His ambition was to be a ship commander. In World War II he realized that ambition, but lost his health. His psychiatric condition, which directly resulted from extensive combat experience in World War II, has existed, with some periods of remission, since his war service. The record amply supports a conclusion that his disability is both chronic and permanent in nature.

 Title 34 was repealed generally by act of August 10, 1956, ch. 1041, 70A Stat. 1, which revised and codified the statutory provisions that related to the Army, Navy, Air Force and Marine Corps, and enacted those provisions into law as Title 10, Armed Forces. 10 U.S.C. § 6148 corresponds substantially to 34 U.S.C. § 855c — 1.

 Omitted in the revision and recodification of August 10, 1956; but see 10 U.S.C. § 1201, which has, in part, substantially the same effect.

 During the typhoon encountered when leaving the Gulf of Leyte, the plaintiff took the conn, acted with his former ability in such a way that the officers later commented he was his old happy self. Later, in the Luzon operation, an attempt by plaintiff to assume the conn resulted in disaster.

 This was contrary to his prior orders strictly prohibiting liquor aboard ship.

 At the trial counsel for defendant commented on plaintiff’s drinking habits, apparently in order to suggest that plaintiff’s brutal behavior towards his kin was caused by alcoholism, rather than by the neuropsychiatric condition — combat neurosis. In view of the medical reports, the VA special investigation of the matter and uneontradicted testimony at the trial, defendant’s position is untenable. It has been officially determined by the VA that not only plaintiff’s neuropsyehiatrie condition is service connected, but that alcoholism and partial cirrhosis as part and parcel of the overall neuropsychiatric condition are also service connected for purposes of awarding disability compensation.

 There is no corroborating proof that plaintiff was ever blamed for such an accident, or that it occurred. There is testimony, however, by plaintiff that it did occur and that he had been accused of it, and there is the further testimony of plaintiff’s wife that he told her of this event and the responsibility he felt for it, at the time of his sick leave at St. Albans and after release from active duty.

 It was probable (and such a theory was developed at the trial through a medical witness), that a return of plaintiff to combat duty would be appropriate therapy for combat neurosis. Defendant’s expert witness concurred, in principle, that such therapy was recognized and applied to cases of combat neurosis during World War II.

 This was his period of most satisfactory adjustment, undoubtedly because of his love for the sea and the self-realization that he was doing something he was trained to do. Nevertheless, after 2 years at this job, he began to break down, was treated by a private physician, admitted to the Kings County Hospital, and discharged as a psychoneurotic. During this period of employment he was usually on the job 3 weeks and at home 1 week. There were many spells of violence. He occasionally vomited blood and in 1956, rather than take a demotion, he resigned.

 Army Reg. 605-250, Mar. 28, 1944, par. 3a.

 Id. at par. 21.

 Tlie regulations governing tie Disability Review Board have incorporated this broad construction of the powers granted. Tbus tbe Adjutant General is to provide that Board with “all available Department of the Army and/or other records pertaining to the health and physical condition of the applicant.” 32 CER § 581.1(a) (2) (ill). And see note 4, infra.

 The regulations promulgated to govern Disability Revie-w Board proceedings have not restricted the inquiry by such a cramped construction. They authorize the Board “to receive additional evidence bearing on the causes and service-connection of [the disability]” without limitation. 32 CFR § 581.1(a) (1) (iii). Indeed they empower the Board to mate its own physical examination of the retired officer at the time of the hearing. 32 CFR § 581.1(b) (2) (V).

 Tlie Medical Survey report makes no reference to the fact that plaintiff’s vision was corrected by glasses and although found disqualified by reason of defective vision to perform active duty in the Regular Navy, he was qualified, with waiver for defective vision, to perform such duty as a Reserve officer.

 Encyclopaedia Britannica, (1957 Ed.) Vol. 23, p. 793B.

 At the trial plaintiff testified that a reply had been received to the effect that plaintiff could qualify for such a transfer only if a graduate of a Naval EOTC program. Plaintiff further testified that Captain Scull considered the reply nonsensical and unsatisfactory. However, plaintiff was resigned to abide by the decision.

 Mr. Oliver, the then executive officer of the LST 213, testified that the typhoon was the type portrayed in the film “Caine Mutiny” and did more damage to the ships of the United States than was done by the Japanese fleet.

 In view of plaintiff's hospitalization, both while on active duty and thereafter, at which times complaints and symptoms were analyzed and diagnoses recorded, it is considered that plaintiff’s combat experiences are material and relevant in demonstrating cause and effect as related to his condition as it existed before and after military service.

 There is lack of uniformity in the proof with respect to the exact time when plaintiff first exhibited abnormal traits of character and emotions. Dr. Kiehard A. Petty, medical officer abroad the LST 213, sent a letter to plaintiff’s attorney, dated August 20, 1961, in which he reviewed the history of plaintiff’s illness and behavior during the 5-month period he served on the LST 213. The doctor concluded by stating, “In summary, I think there is no question that Mr. Hoppock was mentally disturbed at the time that I served on LST 213.” Dr. Petty’s statements confirm, in effect, the testimony of Mr. Oliver that plaintiff was mentally disturbed at the time indicated.

 Part of the defense at the trial of this case centered around the proposition that plaintiff’s illness was caused by his drinking, and that all symptoms of his abnormality were derived from alcoholism. In view of the uncontradicted testimony of several witnesses that plaintiff did not drink to excess before his active duty, and the credible testimony of Mr. Oliver, who was closer to him than any other person at the time of great emotional strain, it appears that the drinking commenced after the first signs of instability. There are several medical conclusions to that effect, accordingly, it is reasonable and proper to accept the established medical theory that drinking was an effect or result of the illness, rather than its cause.

 Defendant, for tie first time in its proposed findings, has objected to the testimony of plaintiff’s wife, sister, mother and mother-in-law, on the grounds that these are interested parties. The credibility of their testimony is strongly impressed with consistency throughout, notwithstanding cross-examination and the further fact of first-hand observation. These persons were truly the only ones capable of making a valid comparison of plaintiff’s reactions to situations before and after his period of active duty. This court has accepted such testimony on several occasions. See Boraiko v. United States, 146 Ct. Cl. 814 (1959) ; Bevins v. United States, 166 Ct. Cl. 547 (1964).

 Defendant has attempted to impeach the testimony of members of plaintiff’s family, pointing out that the St. Albans’ medical records indicate that at this time plaintiff was “a well developed, well nourished young male.” The accuracy of this statement on the examination report is doubtful in view of a notation on a Report of Physical Examination dated September 25, 1945, next to the caption ‘‘Recent gain or loss, amount and cause,” there is the notation “25 recooperated [sic].”

 During the cross-examination of Dr. Gold, Staff Psychiatrist, Naval Medical Center, Bethesda, Maryland, plaintiff’s counsel developed the theory, with which Dr. Gold concurred in principle, that the best therapy for an individual subject to combat neurosis is to send him back to combat duty as soon as possible, or at least to some other type of duty. The purposes of this therapy are to arrest the fixation of the neurosis, to prevent the progress of the symptoms, and to lessen the individual’s guilt over separation from the group. It is important in this regard to assure the patient that he has no serious physical illness and that his condition is only temporary. In no event should the individual be told that he has a psychiatric condition ; for this reason the Armed Forces adopted the name “combat fatigue” rather than some other name which might connote a mental illness.
under this concept for curing a combat neurosis, it is probable that a patient suffering from a combat neurosis would be returned to duty, especially if he so desired.

 The Japanese surrendered August 14, 1945, with formal ceremonies on September 2,1945.

 Plaintiff was living at this time in the apartment of his in-laws. On one occasion, after the death of her husband, the mother-in-law vacated her home because of plaintiff’s brutal behavior.

 During the trial counsel for defendant implied that plaintiff was committed to Kings County Hospital in 1952 because of alcoholism. However, the hospital records do not support a diagnosis of alcoholism.
No diagnosis of alcoholism was made by the Hudson River State Hospital or the VA at this time, or later, although it was recognized that, due to his psychoneurosis, plaintiff drank heavily. The first mention made of alcoholism was in a 1960 psychiatric report, but the notation indicated that it was a manifestation of plaintiff’s neurosis or anxiety reaction. Thereafter, plaintiff’s drinking was always considered to be a symptom of his mental or nervous state.

 Plaintiff was unduly prejudiced In bis attempt to obtain federal employment by a letter from tbe Albany VA office to the Civil Service Commission, dated June 1, 1959, in which it was stated that plaintiff’s condition of alcoholism and cirrhosis, portal of the liver were not service connected and were the result of his misconduct. As a result of a protest concerning that information, a medical consultant for the VA was engaged to study the matter; the doctor concluded that the statement was clearly erroneous ; that the diagnoses of portal cirrhosis and alcoholic, chronic, were completely unjustified on the record; that the diagnosis of chronic alcoholism was doubtful because plaintiff’s drinking was part of his psychiatric disorder; and that in a psychiatric *1189 report made by the hospital at Montrose, New York, on February 1, 1960, alcoholism was included as a manifestation of plaintiff’s psychiatric condition.
Although corrective measures were sought from the VA, the record indicates that the same information, notwithstanding a contrary medical opinion after the statement was made, was given by the VA to the Naval Physical Disability Review Board on December 20, 1960. There can be little doubt that this erroneous information influenced the advisory opinion which the Physical Disability Review Board gave the Naval Correction Board in proceedings before that Board for the correction of plaintiff’s military records.

 As part of the advisory opinion of the Review Board, it quoted, in toto the letter of the VARO, Albany, New York, in which the statement is made that it had been determined “that portal cirrhosis was not incurred or aggravated in service and alcoholism was the result of the veteran’s own willful misconduct.” This determination had been specifically found to have been erroneous by a specialist engaged by the VA to review the matter.